# Gilmore v. The State.

*Indictment for Murder.*

1. *Jury law; construction of statute providing new jury system.* The act approved February 28, 1887, (Acts 1886-87, p. 151) "to more effectually secure competent and well qualified jurors in the several counties of this State," while a general law and changing the entire jury system as found in the Code of 1886, does not in any manner affect the character or operation of the jury law found in the Code of 1886 as a public law, so far as relates to the counties of the State expressly excluded from the operation of the statute of 1887, and does not convert the law of the Code, as applied to those counties expressly excepted from the statute, from a general to a special or local law.

2. *Same; same; repeal of former jury law by its omission from succeeding Code.*—The jury law contained in the Code of 1886, as applied to the counties of the State expressly excluded from the operation of the act approved February 28, 1887, (Acts 1886-87, p. 151) "to more effectually secure competent and well

[Gilmore v. The State.]

qualified jurors in the several counties of this State," was, by being omitted from the Code of 1896, repealed by the act adopting the said later Code.

3. *Change of venue; opinions of petitioner and affiants not sufficient.*—Where on application for a change of venue the petition and the affidavits filed in support thereof contain the mere expressions of opinion on the part of the parties making them, without alleging any distinct, tangible facts upon with such opinions are based, the application is properly overruled; since the mere belief of the party applying for a change of venue, or of the witnesses introduced, that a fair and impartial trial can not be had in the county in which the indictment is found, is insufficient, but the facts and circumstances rendering a fair and impartial trial improbable must appear .

4. *Pleading in criminal case; plea of misnomer.*—In a criminal case, where the defendant files a plea of misnomer, in which he avers that the christian name of the accused as written in the indictment is "Hauston," while the christian name of the defendant is *Houston*, and that, therefore, the defendant is not indicted by his true name, it is the duty of the court to consult the other written portions of the indictment; and if, after doing this, it is found that the doubtful letter can be considered to be the right or proper letter, it will be so accepted; and in such case the plea of misnomer is properly disallowed.

5. *Evidence; admissibility of admissions and confessions.*—While to authorize the admission of declarations and confessions made by the defendant as evidence against him on a trial under a criminal charge, it is the duty of the court to ascertain that they were freely and voluntarily made, still, if the attendant facts and the circumstances surrounding the declarations or confessions show that they were voluntarily made, the rule as to the preliminary ascertainment by the court as to whether the confession was voluntary or involuntary, is sufficiently observed; and the admission of such confession in evidence is free from error.

6. *Homicide; admissibility of evidence.*—On a trial under an indictment for murder, there was evidence that the defendant after shooting the deceased went back into the house and there exhibited a barlow knife with a long blade, stating at the time that the deceased was approaching him with that knife drawn, and that he had to shoot the deceased to keep him from killing him. Other testimony showed that the knife taken from the deceased's hand immediately after he was shot was unopened, and was a small pocket knife. *Held.* That

[Gilmore v. The State.]

the testimony of another witness that he had, a short time before the homicide, sold the defendant a barlow knife with a blade about the length of the one shown him, is competent .and admissible as tending to show the falsity of the defendant's statement, and that it was his own knife that he exhibited.

7. *Same; charge to the jury; properly refused when undue prominence given to particular fact.*—On trial under an indictment .for murder, a charge which instructs the jury that they, "in ,determining who provoked the difficulty, may consider, in connection with all the evidence, the fact, if it be a fact, that the ,deceased had made threats to take the life of the defendant." .is erroneous and properly refused, as giving undue prominence to a particular fact and as being argumentative.

8. *Same; same; same.*—In a criminal case, charges which select and give undue prominence to certain parts of the testimony and ignore other testimony having a contrary tendency, are properly refused.

9. *Same; same.*—In a criminal case, a charge which assumes as a matter of law that the facts hypothecated therein created imminent peril to life or limb of the defendant and postulated .his acquittal on such assumption, together with other facts constituting self defense, is erroneous and properly. refused, .in that it is invasive of the province of the jury, in taking from the jury the right of determining whether the facts hypothesized were sufficient to create imminent peril.

10. *Same; same; intoxication as an excuse for crime.*—On a trial under an indictment for murder, where there was evidence tending to show that at the time of the commission of the offense the defendant was drinking, a charge which instructs the jury that they "may look to the fact, if it be a fact, along with the other evidence, that at the time of the killing, the defendant was intoxicated, in determining whether at the time of the killing he had the mental capacity to entertain the malice, deliberation and premeditation which, with unlawful taking of life, constitute murder in the first degree," is erroneous and properly refused.

11. *Same; same; self-defense.*—On a trial under an indictment for murder, a charge which instructs the jury that if they "have a reasonable doubt as to who brought on the difficulty, and if they have a reasonable doubt as to whether it was necessary for Gilmore (the defendant) to shoot to save his own life or to protect himself from great bodily harm either actual or apparent, then you will find the defendant not guilty," is erroneous and properly refused.

[Gilmore v. The State.]

12. *Same; same; fault in bringing on the difficulty.*—On a trial under an indictment for murder, a charge which instructs the jury that "if the jurors are not convinced beyond all reasonable doubt as to whether Gilmore provoked the difficulty, then, they should find that issue in favor of the defendant," is erroneous and properly refused as being misleading and limiting the jury as to the one issue as to who provoked the difficulty.

13. *Same; same; self-defense.*—On trial under an indictment for murder, a charge which instructs the jury that "before they can convict the defendant of murder they must believe from the evidence beyond all reasonable doubt to a moral certainty that at the time of the shooting the defendant had determined to take the life of deceased maliciously and with premeditation," is erroneous and properly refused; since to render the defendant guilty of murder in the second degree, it was not necessary that he should have determined to take the life of the deceased both "maliciously and with premeditation."

14. *Same; same; charge as to murder and manslaughter.*—In a trial under an indictment for murder, a charge which instructs the jury that "malice express or implied distinguishes murder from manslaughter, and a sudden transport of passion caused by adequate provocation, if it suspends the exercise of judgment and dominates volition so as to exclude premeditation and a previously formed design, although it does not entirely dethrone reason, is sufficient to reduce the killing to manslaughter," is erroneous and properly refused, since such passion as described in the charge is not necessarily inconsistent with the existence of malice.

15. *Same; same; same.*—On a trial under an indictment for murder, a charge which, after instructing the jury that it is murder only when a blow is struck with malice and premeditation, further instructs them that "although the jury may believe that the defendant killed the deceased, and although the jury may not believe it justifiable, yet if it was done with malice and premeditation you can not find the defendant guilty of murder," is erroneous and properly refused.

16. *Same; same; self-defense.*—On a trial under an indictment for murder, a charge which instructs the jury that "if the defendant acted in self-defense, or if the jury find from all the evidence that the probability is that he did act in self-defense the jury must find the defendant not guilty," is erroneous and properly refused as failing to set forth the constituents of self-defense.

[Gilmore v. The State.]

APPEAL from the Circuit Court of Geneva..
Tried before the Hon. JOHN P. HUBBARD..

The appellant was indicted and tried for the murder of Henry Thompson by shooting him with a pistol, was convicted of murder in the first degree and sentenced to the penitentiary for life. Before entering upon the trial of the case, the defendant filed his petition and moved the court for a change of venue, in which he averred that he could not have a fair and impartial trial in the county for the reasons as follows: "That the public sentiment of the people of this county has become so excited and aroused to defendant that he can not get a fair trial in this county; that various persons of prominence in this county living in various portions of the county have been and are taking active stands against defendant and using their influence to create a general sentiment that defendant is guilty; that there are many of them now in Geneva so using their influence, and that various persons are constantly giving public expression to their opinions that defendant is guilty of the crime charged against him, and that on the whole case as thus made he can not get a fair and impartial trial of this cause." To support this motion there were affidavits made by the defendant Houston Gilmore and his attorney, M. Sollie, and J. J. Gilmore. These affidavits were filed with the motion and averred that in the opinion of the affiants, it was necessary that the defendant should be granted a change of venue in order for him to secure a fair trial, because the condition of the public mind in Geneva county was, at the time, so excited that it would prevent him having a fair and impartial trial at that time in Geneva county. This motion was overruled, and the defendant duly excepted thereto. The defendant moved the court to quash the special venire drawn for the trial of his case upon several grounds. The principal ground and the one relied on to have the motion granted was that the regular venire of jurors drawn and summoned for the week of the court in which the trial was to be had, and which constituted a part of the special venire drawn

for the trial of the defendant, was not drawn by the sheriff, the clerk of the circuit court and the judge of probate of Geneva county, but was drawn by the county commissioners of said county acting as a jury commission. The facts constituting the grounds of this motion were admitted, and upon hearing thereof, the court overruled the motion, and to this ruling the defendant duly excepted. The defendant then moved the court to quash the indictment preferred against him, upon the ground that said indictment was returned by the grand jury which was drawn by the commissioners of Geneva county acting as a jury commission, and not by the sheriff, judge of probate and clerk of the circuit court of Geneva county, as required by law. The facts constituting the ground upon which the motion was made were admitted. The court overruled the motion, and to this ruling the defendant duly excepted.

The defendant filed a plea in abatement in which he averred that the indictment was not preferred against him; that the defendant named in the indictment, as written therein, was "Hauston" Gilmore, while the name of the defendant was Houston Gilmore. The facts relating to this plea and the rulings thereon are shown in the opinion.

On the trial of the case it was shown that the killing occurred about 2 o'clock in the morning at the home of one J. J. Gilmore, who was the grandfather of the defendant; that there was a dance there on the night of the killing.

The State's evidence tended to show the following facts: Houston Gilmore and Henry Thompson, the deceased, were both at the dance and were both drunk. A short time before the fatal difficulty, the defendant walked up to Henry Thompson and tapping him on the shoulder, told him that he understood that he had said that he, Thompson, could whip the defendant before he could get out of the yard. Thompson denied having made such statement and Houston Gilmore told him to walk out of the house into the yard. The two men walked from the house into the yard and outside of the gate; Houston Gilmore walking in front. At the gate they were

joined by Albert Owens and Dave Thomas. When they were outside of the gate, the defendant repeated his statement, and upon Thompson denying it, the defendant called him a d— liar, and told Thompson that he wanted to give him a chance to whip him right then; that Thompson replied that he did not want to have a row, that he had nothing to fight him with, and pulling a black handled knife from his pocket, stated that that was the only weapon he had. Thereupon Albert Owens and Dave Thomas interfered. Thompson then walked off some distance while Owens was holding the defendant. After Thompson had gotten ten or fifteen steps away, Owens released the defendant and they all started into the house. Something being said about settling the difficulty between the two, the defendant walked to where Thompson was standing, and stated that he could settle it then and again charged Thompson with making the statement. Thompson replied that it was a G— d— lie, whereupon the defendant told him not to curse him, and drew his pistol and fired three times, each of the shots striking Thompson, from the effects of which wounds he died in a few moments.

There was evidence for the defendant tending to show that he shot the deceased in self-defense; that the deceased had threatened the life of the defendant, which threats were communicated to the defendant.

The defendant as a witness in his own behalf testified that after he had stated that he and the deceased could settle the matter themselves, the deceased called him a G— d— liar and started towards him, taking a knife or pistol from his pocket, and that as he started towards him, the defendant fired the fatal shots.

Several of the witnesses for the State testified that after the shooting, when the defendant entered the house, he walked into a room where there were several people and stated that he had "killed Henry Thompson and killed him in cold blood." The defendant objected to this statement on the part of each of the witnesses as made, and moved the court to exclude the same, on the ground that it was irrelevant, immaterial and incompetent. The court overruled each of such objections

and motions, and to each of these rulings the defendant separately excepted. The several witnesses so testifying to these statements on the part of the defendant also testified in connection therewith that immediately upon making the statement the defendant stated that he was going to leave the country, and shook hands with several of his friends who were in the room.

One of the witnesses for the State testified that on the morning after the shooting, the defendant came to his house and after saluting him said: "I got me a man last night." The defendant objected to this testimony and moved the court to exclude the same from the jury, upon the ground that it was irrelevant, immaterial and incompetent. The court overruled the motion and objection, and the defendant duly excepted.

Another witness for the State testified that on the morning after Henry Thompson was killed, the defendant came to her house and told her that he was going to leave, and then bade her good-bye.

One Jeff Adkinson, a witness for the State, testified that in the early part of the night of the killing, Henry Thompson was very much under the influence of whiskey, and that he took Thompson to the room and got him to lie down; that while they were in the room, Thompson told him that he was going to whip Houston Gilmore and pulled out a large barlow knife while he was talking about Gilmore. That thereupon the witness Adkinson asked Thompson to exchange knives with him and gave him a small black handled pocket knife in exchange for the large barlow knife. Each of these knives were introduced in evidence and the witness, Jeff Adkinson identified the black handled knife which was taken from the body of Thompson after he was shot as being the knife he had traded with him.

Some of the witnesses for the defendant testified that after the shooting the defendant came into the room of the house where there were several persons, and pulling a large barlow knife from his pocket. he stated that Thompson was coming on him with that knife, and he had to kill him or be killed by him; that the knife so taken from his pocket after the shooting was shaped somewhat

[Gilmore v. The State.]

like the knife that was introduced in evidence, while Jeff Adkinson was testifying, but was not the same knife, and was not exactly of the same character.

A. C. Parker, a witness for the State, testified that he had, before the killing, sold to the defendant a large barlow knife. Upon being shown the large barlow knife which was introduced in evidence and which was identified as the one Jeff Adkinson exchanged with the deceased, the witness Parker was asked if that was the knife, or was it one like that. He answered that it was not the knife; and while the one he sold to the defendant was not of the same character, it was something like it. The defendant objected to all of this testimony on the part of the witness Parker, and moved to exclude the same from the jury, on the ground that it was illegal, immaterial and incompetent. The court overruled the motion and objection, and the defendant duly excepted.

Upon the introduction of all the evidence the defendant requested the court to give to the jury the following written charges, and separately excepted to the court's refusal to give each of them as asked: (A.) "The jury in determining who provoked the difficulty may consider, in connection with all the evidence, the fact, if it be a fact, that Thompson had made threats to take the life of the defendant." (B.) "If the jury shall find the defendant guilty, it is then their duty to look to all the facts in evidence, including defendant's age and intelligence, his condition as to being intoxicated, if he was so at the time of the killing, the threats, if any were made by deceased, and communicated to the defendant before the killing, the circumstances under which the killing occurred, and any demonstration if any was made at the time of the killing by deceased, in determining what punishment they will inflict upon the defendant." (C.) "Although the jury may believe from the evidence that just prior to the shooting in question, defendant and deceased had a difficulty in which defendant drew a pistol on deceased, if after this, on the request of the witnesses Owens and Thomas then present, defendant agreed to leave off or drop the difficulty, and did then and there abandon the difficulty, and that he went from there to the cane mill

in question at the request of Thompson, not intending again to raise the difficulty, and was after that time free from fault in bringing on the difficulty which ensued, and the deceased without defendant being then in fault called defendant a liar and put his hand to his (pocket) and drew therefrom a knife and advanced toward defendant, being then about four feet from defendant, and that defendant could not have retreated without probably increasing his danger, then he had the right to fire and take the life of deceased, and must be acquitted." (D.) "The jury may look to the fact, if it be a fact, along with the other evidence that at the time of the killing defendant was intoxicated, in determining whether he had at the time of the killing the mental capacity to entertain the malice, deliberation and premeditation which with unlawfully taking of human life constitutes murder in the first degree." (E.) "If the jury have a reasonable doubt as to who brought on the difficulty, and if they have a reasonable doubt as to whether it was necessary for Gilmore to shoot to save his own life, or to protect himself from great bodily (harm), either actual or apparent, then you will find the defendant not guilty." (F.) "If the jurors are not convinced beyond all reasonable doubt as to whether Gilmore provoked the difficulty, then you should find that issue in favor of the defendant." (G.) "If Thompson had threatened to take the life of Gilmore and if such threats were communicated to Gilmore, and if before the shot was fired Thompson was advancing towards Gilmore, cursing him and in a threatening attitude, and if Gilmore, by such demonstrations and threats, was reasonably satisfied that it was necessary for him to shoot to save his own life, then Gilmore had the right to act upon such appearances and shoot, provided defendant did not bring on the difficulty." (H.) "Before the jury can convict the defendant of murder, they must believe from the evidence beyond all reasonable doubt to a moral certainty that at the time of the shooting the defendant had determined to take the life of deceased maliciously and with premeditation." (I.) "Malice, express or implied, distinguishes murder from manslaughter, and a sudden transport of passion caused

by adequate provocation, if it suspends the exercise of judgment and dominates volition, so as to exclude premeditation and a previously formed design, although it does not entirely dethrone reason, is sufficient to reduce a killing to manslaughter." (J.) "It is murder only when it is done with malice and premeditation. And although the jury may believe that Gilmore killed Thompson, and although the jury may not believe it was justifiable, yet, if it was done with malice and premeditation you can not find the defendant guilty of murder." (K.) "If Thompson had made threats to take the life of defendant, and if this was known to defendant, and if defendant did not provoke the difficulty, then the defendant had the right to anticipate his adversary, Thompson, and to act quicker than he otherwise would, if as a matter of fact Thompson was making hostile demonstration towards the defendant at the time of the shooting." (L.) "If when Gilmore shot Thompson there was a present pending danger, either real or apparent, to take Gilmore's life or limbs, or of great bodily harm, from which there was no probable means of escape, then you will find the defendant not guilty, unless you are convinced beyond a reasonable doubt that Gilmore provoked the difficulty. and the burden is upon the. State to prove that Gilmore provoked the difficulty." (M.) "Even though the jury may believe that when Gilmore shot Thompson that Thompson did not have a knife in his hands in position for immediate use, yet, if under all the circumstances the defendant was reasonably impressed that Thompson intended cutting him and was advancing upon him, then Gilmore had the right to shoot, provided he did not bring on the difficulty, and provided there was no reasonable mode of escape, without apparently increasing his peril." (N.) "The court charges the jury that there was no duty resting upon Gilmore to retreat, if at the time Thompson was advancing upon him, if he did advance upon him, he, Thompson was in a threatening attitude towards Gilmore, and if the necessity to shoot to protect himself was then either actual, or reasonably apparent." (O.) "The danger to the defendant need not have been real, but if

[Gilmore v. The State.]

from all the facts including the threats made by the deceased against the defendant, if such threats were made, the defendant was reasonably impressed at the time of the shooting that it was necessary for him to shoot to protect his own life or to protect himself from great bodily harm, then the defendant had the right to shoot, provided he was free from fault in bringing on the difficulty." (P.) "If Gilmore and Thompson abandoned the difficulty where Thomas and Owens were, and if Thompson walked off and asked Gilmore to come to where he was, and if Gilmore went to where Thompson was to adjust the matter, and if when Gilmore got to where Thompson was, the latter commenced to curse Gilmore and to advance upon him in a threatening manner, and if by such acts or conduct he created in the mind of the defendant a reasonable necessity to shoot to protect himself from death or great bodily harm, then you will find the defendant not guilty, unless there was reasonable mode of escape without reasonably increasing his peril." (Q.) "The court charges the jury that it is not upon the defendant to show that he was free from fault in bringing on the difficulty, but that the burden is upon the State, and that if the jury have a reasonable doubt. as to who brought on the difficulty, then they will find that issue in favor of the defendant, and unless the evidence convinces you beyond all reasonable doubt that Gilmore brought on the difficulty, then Gilmore had the right to shoot Thompson, if at the time Thompson was advancing towards Gilmore in. a threatening attitude, provided the danger was either actual or reasonably apparent." (R.) "If the defendant acted in self-defense, or if the jury find from all the evidence that the probability is he did act in self-defense, the jury must find the defendant not guilty."

SOLLIE & KIRKLAND, and MULKEY & MULKEY, for appellant.—The motion to quash the venire of regular jurors and the motion to quash the indictment should have been sustained. Under the law it was the duty of the probate judge, clerk and sheriff to draw the jurors. The jury law applicable to Geneva county was not re-

[Gilmore v. The State.]

pealed by the adoption of the Code of 1896.

The court certainly committed an error in permitting the witness Adkinson to testify to the confession of Gilmore, that he had "killed Thompson and killed him in cold blood."—1 Greenleaf on Evidence, § 219 *et seq.;* 1 Brick. Dig. 509; *Britter v. State,* 26 Ala. 107; *Aiken v. State,* 35 Ala. 399; *Washington v. State,* 53 Ala. 29; *Moses v. State,* 36 Ala. 211; *Owens v. State,* 78 Ala. 425; *Amos v. State,* 83 Ala. 1; *Jackson v. State,* 83 Ala. 76.

Charge (A) requested by the defendant, should have been given. There was conflict in the testimony as to who provoked or brought on the difficulty, and in determining this question the jury had the right to consider any threats made by the deceased against the defendant. *Green v. State,* 69 Ala. 6; *Roberts v. State,* 68 Ala. 156.

Charge (C) should have been given. The theory of the defendant was that he acted in self-defense, and his evidence, if believed, proved this. His testimony tends to show every fact hypothesized in the charge, and there can be no question but that the charge asserts every element of self-defense.—*Jackson v. State,* 78 Ala. 18; *Jackson v. State,* 94 Ala. 85; *Williams v. State,* 103 Ala. 83; *Miller v. State,* 107 Ala. 1; *Wilkins v. State,* 98 Ala. 1; *Harrison v. State,* 78 Ala. 5.

CHAS. G. BROWN, Attorney-General, for the State. The application for a change of venue and the affidavits introduced in support thereof are but mere expressions, opinions, and beliefs, and no sufficient facts or reasons are specifically set forth why defendant could not have had a fair and impartial trial in said county. Criminal Code of 1896, § 5309; *Jackson's Case,* 104 Ala. 1; *Byers' Case,* 105 Ala. 26; *Thompson v. State,* 122 Ala. 12; 26 So. Rep. 141.

The rulings of the Court on the motion to quash and plea in abatement seeking to quash the indictment and the venire of grand and petit jurors were not erroneous. *Thompson v. State,* 122 Ala. 12; 26 So. Rep. 141; *Baker v. State,* 122 Ala. 1; 26 So. Rep. 197.

The plea of misnomer: This question by agreement

was presented in two ways. 1st. To the jury, and 2d
to the Court on the motion to strike plea from file. And
this was done by agreement for the benefit of the de-
fendant. See on this question 1 Bishop Criminal Pro-
cedure (3d ed.), § 338; *Ib.* § 192 and note 3; *Sayres v.
State,* 30 Ala. 15; *Armstrong v. Burroughs,* 6 Rawls,
268.

As to the many objections urged against the admissi-
bility of the confessions, it is insisted, that whilst the
record does not show any examinations *voir dire* as to
promises, threats, etc., yet the facts and circumstances
under which they were made affirmatively show that the
confessions were voluntary.—*Price v. State,* 117 Ala.
114; *Stone v. State,* 105 Ala. 60; *Washington v. State,*
106 Ala. 58; *Love v. State,* 124 Ala. 82.

DOWDELL, J.—The grand jury that preferred the
indictment in this case, and the petit jury that tried the
defendant were both regularly organized under the jury
law as contained in chapter 166, page 347 of the Crimi-
nal Code of 1896.

The question presented is, do the provisions contained
in this chapter apply to the county of Geneva; and if
they do, neither the manner of organizing the grand and
petit juries nor the validity of the indictment is ques-
tioned. Under the provisions contained in this chapter
the drawing of regular juries is made the duty of the
county commissioners, and by the commissioners of the
county of Geneva the grand jury and the regular petit
juries in the case at bar were drawn.

The contention of the appellant is that under the law
it was the duty of the probate judge, clerk and sheriff
to draw the regular jurors. This contention is based
upon the following proposition which we quote as stated
by appellant's counsel in their brief: "By an act of the
legislature, passed after the adoption of the Code of
1886, but incorporated in that Code in a note, the duty
of drawing jurors, both grand and petit, was devolved
upon the commissioners' court. This act changed the
entire jury system as found in the Code of 1886, com-
mencing at section 4299, and created an entirely new

3

system of drawing jurors, and expressly repealed sections 4299 *et seq.* of the Code of 1886.   But the provisions of this act did not apply to fourteen counties of the State, and Geneva county among them.   In other words, Geneva county was expressly exempted from the operation of that act, and of course was governed in the matter of drawing jurors by the law in the Code.   In the Code of 1896 this act is incorporated, as constituting the jury law for the entire State, but the counties named in the original act, as passed, as being exempted from its operation are not mentioned."

It is argued by counsel that by the passage of the above act of February 28th, 1887, (Acts, 1886-87, p. 151), which was incorporated in the Code of 1886 in a note, that the law contained in the Code, which prior to the passage of said act applied to the entire State, was converted into and became a special or local law, or if a public law, not a general and permanent law, and hence was not repealed by the adoption of the Code of 1896.   The law contained in the Code of 1886 regulating the drawing of juries was essentially a public law general and permanent in its character, and the effect of the passage of said act of February 28th, 1887, was to withdraw from its operation and influence the counties of the State, other than the fourteen counties excepted in said act, without in any manner affecting the character of the law of the Code as a public law.   There was no re-enactment of the law of the Code, and although repealed as to the other counties of the State by the act of February 28th, 1887, it, the old, law, remained unchanged and in full force and vigor in its application to the fourteen counties excepted by the act.   The reasoning for the change of the law from a public to a local one rests wholly in implication.   The doctrine of the repeal of statutes by implication is not favored by the court, nor any more can the change of a statute from its character as a public and general law to a special or local law by implication be favored.   The statutes in question which were codified into the Code of 1886 as public laws, general and permanent in their nature, remained in the Code as such as long as there remained a field for their

operation, and as such public, general and permanent laws not having been adopted into the Code of 1896, but being omitted from the codification, by the act adopting the Code of 1896, they were repealed.

The denial of the court of the application for a change of venue though excepted to and assigned as error, although no assignment of error on the record was required under the statute, is not so much as alluded to in the elaborate brief of counsel filed in the case. And after consideration of the application and the affidavits filed in support of it, we conclude that counsel remained silent for the reason that there was no merit in the application. The application does not specifically set forth any sufficient facts or reason why the defendant could not have a fair and impartial trial in said county, and the affidavits in support of it contain only expressions of opinion and belief.—Crim. Code, 1896, § 5309; *Jackson's Case*, 104 Ala. 1; *Byers' Case*, 105 Ala. 31; *Thompson v. State*, 122 Ala. 12; 26 So. Rep. 141.

The plea of misnomer raised the question as to whether the defendant's Christian or given name as written in the indictment is *Houston* or *Hauston*, his true name being Houston; the contention by defendant being, that as written in the indictment the second letter in the name is an *a* and not *o,* and therefore that he is not indicted by his true name of *Houston,* but as *Hauston.* The original indictment is certified here for our inspection. We find upon an examination of the indictment in looking to other words written therein that the letters *a* and *o* in their physical structure are very similar, and we further find upon inspection of the original indictment that the second letter in the given name of the defendant as written is identical in form and appearance with the letter *o* just before the letter *u* in the word "aforethought," which is written in the indictment. In cases where the orthography is doubtful it is the duty of the courts to consult the context, and after consulting the context, if it be found as in this case, that the doubtful letter can as well be taken as an *o* as an *a,* the right or proper letter will be accepted. The court and not the jury should decide what are the words of an indict-

ment or other pleading.— Bishop Crim. Procedure (3d ed.), § 338. In this case by agreement of parties the question was submitted both to the court and the jury. The solicitor who drew the indictment testified that the letter in question was an *o*, and 'that it was the way he made that letter in writing.' On this evidence, it being all the testimony offered on this issue, the court at the request of the solicitor in writing gave the general charge for the State. There was no error in the giving of the charge, nor in the other ruling of the court on the plea of misnomer.

It is here insisted that the statements made by the defendant immediately after the killing, and on the next day, which were in the nature of confessions, were improperly admitted in evidence against the defendant, not having been first shown to be voluntary. The objection to this evidence when offered was general—that it was incompetent, inadmissible and illegal. It is shown that at the time these statements were made, the defendant was preparing to leave the scene of the killing, bidding good-bye to those present, that he was not under arrest, nor under any physical restraint or duress whatever, nor was there the slightest pretense that the statements were induced by any promises held out or threats made by any one, and that after making the statements or confessions, without hindrance or interference from any source, he took his leave from the scene of his crime. And on the next day, the statement made by him when passing the home of the witness, who testified to the statement, was made with like freedom from duress or restraint, and under circumstances which repelled any presumption that it was not freely and voluntarily made. That the confessions were voluntarily made is, we think, clearly shown by the attendant facts and circumstances. Such being the case, the rule as to the preliminary ascertainment by the court of the character of the confession, whether voluntary or involuntary, is as well satisfied, as if the witness had stated on *voir dire* examination that no promises, threats, etc., were made. It was the duty of the court to ascertain that they were freely and voluntarily made, and on ap-

peal the Supreme Court will presume that the trial court performed its duty unless the record affirmatively shows that the court committed an error in its action. And it cannot be said that error is affirmatively shown by the record, when the facts and circumstances attending the confession, as shown by the record, rebut any presumption that the confession was involuntary.—*Price v. State,* 117 Ala. 114-116; *Stone v. State,* 105 Ala. 60; *Washington v. State,* 106 Ala. 58; *Love v. State,* 124 Ala. 82.

There was evidence that the defendant after shooting the deceased turned and went back into the house, and that in the house he exhibited a long blade barlow knife and said in substance, "this is the knife Thompson had when coming on to me, and I had to shoot him to keep him from killing me." Other testimony showed that the knife taken from Thompson's hand immediately after he was shot, he then being dead, was unopened and was a small black handle knife. This rendered the evidence of the witness Parker to the effect, that he had a short time before the homicide sold to the defendant a barlow knife with blade and handle about the length of the one shown witness, proper and relevant as tending to show the falsity of the defendant's statement, and that it was his own knife which he exhibited.

Charge A requested by the defendant is faulty in singling out and giving undue prominence to a particular fact, and it is not relieved of this objection by adding, that it is to be taken in connection with the other evidence in the case. Such charges have been condemned by this court as being argumentative.—*Brantley v. State,* 91 Ala. 47; *Watkins v. State,* 89 Ala. 85; *Hussey v. State,* 86 Ala. 34.

Charge B if bad for no other reason is faulty in that it selects and gives undue prominence to certain parts of the testimony most favorable to the defendant and ignores, in the failure to particularize, other testimony having a contrary tendency.

Charge C is faulty in assuming as a matter of law that the facts postulated created imminent peril to life or limb, and in taking from the jury the right and duty

of determining whether the facts hypothesized were suffi-, cient to create imminent peril, actual or reasonably apparent.

Charge D is bad in that it does not define the degree of intoxication, and that it was such a degree of drunkenness as would render the defendant incapable of premeditation and deliberation, since a man may be intoxicated and yet not be so drunk as to render him incapable of deliberation and premeditation.—*Morrison v. State,* 84 Ala. 405. Moreover, the whole testimony in this case shows that the defendant was not so intoxicated as to be incapable of deliberation and premeditation.

Charge E, besides being bad in that it pretermits the doctrine of retreat, is bad in other respects. It is a mistake to postulate a charge on the theory that the deceased provoked the difficulty, or on a reasonable doubt as to defendant's having provoked the difficulty, or as to which of the two provoked or brought on the difficulty, as these are not equivalent to that freedom from all fault on the part of the defendant which the law enjoins, either in bringing on, provoking or encouraging the difficulty, or the freedom from willingness of the defendant to enter into the difficulty and slay the deceased; for although the deceased may have provoked or brought on the difficulty, yet if the defendant willingly enters into the difficulty— is willing to engage in the deadly combat and manifests such willingness by word or deed—and in such mutual combat slays the deceased, he is not free from fault and is not guiltless.—*Bouldin v. State,* 102 Ala. 83; *Baker v. State,* 81 Ala. 38; *Kirby v. State,* 89 Ala. 63; *Gibson v. State,* 91 Ala. 64.

Charge F is misleading in limiting the jury to the one issue as to who provoked the difficulty. The jury might believe that the deceased first provoked the difficulty, yet the defendant would not be wholly free from fault, if he encouraged or willingly entered into the difficulty. The issue is not solely who first provoked the difficulty, but it is the total freedom from fault on the part of the defendant. There might be no reasonable doubt that the deceased provoked the difficulty, and yet the State would fully discharge the burden of proof on it by show-

[Gilmore v. The State.]

ing that the defendant encouraged by word or deed the difficulty or willingly entered into mutual combat.—*Hussey v. State,* 86 Ala. 634; *Brantley v. State,* 91 Ala. 47; *Watkins v. State,* 89 Ala. 85.

Charge G is subject to the same criticism as charge E, besides being faulty in that it ignores the doctrine of retreat.—*Brown v. State,* 83 Ala. 35.

Charge H was properly refused. To render the defendant guilty of murder in the second degree it is not necessary that he had determined to take the life of the deceased both "*maliciously and with premeditation.*"

Charge I was properly refused. Premeditation and a previously formed design may be excluded by a sudden transport of passion on adequate provocation, and yet malice may remain. Such sudden passion is not inconsistent with malice.—*Martin v. State,* 119 Ala. 1.

Charge J is manifestly erroneous. Premeditation is not an essential element of murder in the second degree. Moreover, this charge asserts that, although the jury may believe that the homicide was unjustifiable, yet if it was done with malice and premeditation the defendant cannot be convicted of murder. This is palpably erroneous.

It is unnecessary to pursue the course of separately criticising the remaining charges designated as K, L, M, N, O, P, Q and R, which were refused to the defendant. It is sufficient to say of these charges that each and every one of them are characterized by some one of the infirmities pointed out in the other charges, which we have discussed. They are either misleading or some one of the essential elements of self-defense is pretermitted, or the law incorrectly stated as to the doctrine of retreat or imminency of peril. The last charge, R, was condemned by this court in the case of *Miller v. State,* 107 Ala. 40. It is bad in that it omits to set out the constituent elements of self-defense. We have carefully considered each and every one of the charges refused to the defendant, and we are of the opinion that they were properly refused.

We find no error in the record, and the judgment of the circuit court must be affirmed.