SEAY v. STATE. (8 Div. 429.)

(Supreme Court of Alabama. May 4, 1922.)

1. Criminal law ⚖=489—Refusal to allow cross-examination of medical expert held error.

In a prosecution for murder, where the defense of insanity was interposed, and it appeared that a medical expert had testified as to defendant's sanity for the state, it was error to refuse to allow defendant to cross-examine him, in an effort to neutralize his testimony, by getting all the facts before him in the form of hypothetical questions.

2. Criminal law ⚖=591—Refusal of continuance on ground of mob intimidation held error.

In a prosecution for murder, where it appeared that a mob, gathered in the courtroom and around the courthouse and jail, attempted to break the jail lock and get at accused, but was restrained by vigilance of the sheriff, and did not disperse after an admonition by officers in the hearing of the jury, it was error to refuse a continuance.

3. Criminal law ⚖=913(1)—Refusal of new trial on ground of intimidation by mob held error.

In a prosecution for murder, where it appeared that a mob, gathered in the courtroom

and around the courthouse and jail, attempted to break the jail lock and get at accused, but was restrained by the vigilance of the sheriff, and did not disperse after an admonition by officers in the hearing of the jury, it was error to refuse a new trial.

Appeal from Circuit Court, Lauderdale County; C. P. Almon, Judge.

F. Whitt Seay was convicted of murder in the first degree, and he appeals. Reversed and remanded.

During the trial of the case the defendant filed a motion for a continuance in the following words:

"Comes the defendant, F. Whitt Seay, and moves the court to enter an order continuing this cause, for that:

"First. Since the trial was entered on and the evidence in part taken, and after adjournment of court on the 9th inst., one of the jurors sitting in said cause, to wit, one Goode, became ill, and on convening of court on the morning of the 10th inst. the juror was unable to hear said cause, and court adjourned until 1:30, at which times the court reconvened or reassembled, and the said juror answered to interrogatories propounded by the court that his condition was such that he would be unable at the present time to further serve as a juror in the case; that he was suffering all the time. Whereupon the court, after instructing the jury not to separate, adjourned until 9 o'clock on the 11th inst., to determine then whether the cause would be continued or resumed.

"Second. That while the said juror was sick on the 10th inst., as set forth in the first ground of this motion, he was, without the knowledge or consent of the defendant, more than once attended by one Dr. Jackson, a witness summoned in said cause to testify in behalf of the state, who attended said juror out of court and at the county jail, where the jury was being kept, and examined him and drew his urine from his bladder in an effort to relieve him.

"Third. That the jury in said cause was, while not sitting as such in court, kept by the sheriff at the county jail, at the jailer's house near the jail as aforesaid. That said trial has been attended throughout by large numbers of people, some 2,000 or 1,500, who packed and jammed the courthouse, filling all the aisles, windows, balconies up to the bar and around the jury box, etc. The court kept them away from the jury, and the hallways outside the courtroom. That the crowd in court has to a great degree been heedless to the requests of the court, so much so that in undertaking to organize the jury it was necessary for court to adjourn from, to wit, 10 o'clock on the morning of the 9th until 1:30, because the crowd would not quiet or make way so that the jurors could reach the bar when called, and instruct the sheriff not to let any in the court at that time, but jurors, witnesses, etc. (and notwithstanding such instructions the courtroom was packed that evening). That immediately upon court adjourning, after recommencing on the 10th, on account of the illness of the juror Goode as set out in paragraph 1, the jury and the defendant were taken to their respective places of abode, viz. the county jail, the jury to the jailer's residence, and defendant to county jail, and a large crowd, viz. from 300 to 500 followed them to the jail, or soon assembled there. That said crowd were densely packed in front of the jail, and extended around on the street in front of the residence part of the jail, and when they had so assembled an effort was made to break the lock of the gate leading to the steps of the jail, which effort was frustrated by the sheriff, who was standing guard on an upper balcony, and he threatened to shoot the first man who entered the inclosure. The said crowd remained around said jail all evening and until late into the night, and would not disperse, notwithstanding that during the course of the evening they were addressed by the circuit judge presiding on said trial, the solicitor of the district, and the Attorney General, who, or some of whom, assured them that the trial would be resumed on the morning of the 11th, and during the course of the afternoon various threats of violence against the defendant were made promiscuously through the crowd, and such statements as that the defendant ought to be hanged, and they couldn't see how the jury could do anything but hang him. At times there was disorder in the crowd, and one or more fights engaged in. During a large part of the afternoon, if not all of it, until about 6 o'clock, the jury in said cause was on the porch of the residence part of the jail, within 15 or 20 feet of a part of the crowd, and where they could witness and hear the clamor of the mob. After that time the jury was removed to some place to defendant unknown."

Callahan & Harris, of Decatur, for appellant.

The facts set up in defendant's motion for continuance conclusively show that the trial should have been stopped by the judge, because there could be no fair trial under such conditions. The trial must be just, as well as the verdict reached through its appliances. 84 Ala. 410, 4 South. 521; 16 Ala. App. 61, 75 South. 267; 199 Ala. 411, 74 South. 454; 179 Ala. 27, 60 South. 908; 179 Ala. 58, 60 South. 392, Ann. Cas. 1915C, 691; 227 Pa. 116, 75 Atl. 1023, 136 Am. St. Rep. 872. The motion for new trial, upon the grounds stated in the motion for continuance, should have been granted. The court erred in sustaining objections to the defendant's questions with hypotheses to the witness Dr. Jackson, examined by the state as an expert. 174 Ala. 4, 56 South. 913; 11 Ala. App. 321, 66 South. 829; 12 Ala. 648; 143 Ala. 28, 38 South. 919.

Harwell G. Davis, Atty. Gen., and Lamar Field, Asst. Atty. Gen., for the State.

The granting or refusing of a motion for continuance is a matter within the discretion of the court. 4 Mich. Ala. Dig. p. 267, § 387; 13 Mich. Ala. Dig. p. 707, § 387.

ANDERSON, C. J. This appellant was tried and convicted of murder in the first degree and was given the death penalty. The

homicide and the defendant's commission of same was established without dispute, and the only seriously controverted issue that was submitted to the jury was his insanity vel non at the time of the killing. The defendant offered much evidence tending to establish his insanity, including the opinion of several alienists or mental experts. The state, on the other hand, offered several nonexpert witnesses, who were acquainted with the defendant and who testified that he was sane. The state also offered as a witness Dr. Jackson, who qualified as a medical expert, and who disclosed a study of leading works on insanity and more experience therewith than the average doctor. Not only was a predicate laid as to the qualification of Dr. Jackson as an expert, but he was permitted to give his opinion, upon direct examination, as an expert upon mental disease, and was asked for his opinion as to the sanity of this defendant, based, not upon his acquaintance and personal observation alone, but in connection with his "knowledge of nervous and mental disease." The witness said:

"I would say that he is sane, so far as my knowledge of his past is concerned."

[1] The state having gotten the benefit of this testimony, it was but just and fair for the defendant to cross-examine this witness, and get his opinion as to his mental condition, based upon the hypothesis contained in the question, especially in view of the fact that said witness Jackson guarded his opinion that defendant was sane by disclaiming, or excluding, a knowledge of his past, and the hypothetical question sought to get defendant's past history, condition, and conduct before said witness, and then get from him an opinion based upon all of the facts instead of a part of same. Nor can the action of the trial court be justified upon the statement of counsel for the state that Dr. Jackson had not been introduced by the state as an expert, as he was shown to be such and so used by the character of questions asked him upon direct examination and his replies thereto, or by the subsequent statement of Dr. Jackson that he did not claim to be an alienist or an expert on insanity. We think the witness simply meant to say that he did not treat insane patients, but did not intend to contradict himself as to what he had previously stated as to his study of mental disease and his ability to diagnose such cases. Moreover, if he was expert enough for the state to get his opinion on scientific questions relating to mental disease and of the sanity vel non of this defendant, based in part upon his knowledge of mental and nervous disease, he should have been subjected to the defendant's right to cross-examination in an effort to neutralize his testimony by getting all the material facts before him.

[2, 3] While granting or refusing a continuance is usually discretionary with the trial court, and the ruling in this respect will not be revised by this court, in the absence of an abuse of discretion, we think that the record shows such a state of facts as to demand a pronouncement by this court of reversible error on the part of the trial court in overruling the defendant's motion to withdraw the case from the jury and continue same for the reasons set out in the motion; the facts as there set out being practically undisputed. (The reporter will set out the motion.) The trial court also erred in not granting the motion for a new trial, because the defendant did not have a fair and impartial trial. The offense charged and the manner of perpetration was so harrowing and revolting as to stir the blood of the coolest and most law-abiding.

"But the law should prevail, without any reference to the magnitude or brutality of the offense charged. No matter how revolting the accusation, how clear the proof, or how degraded, or even brutal, the offender, the Constitution, the law, the very genius of Anglo-American liberty, demand a fair and impartial trial. If guilty, let him suffer such penalty as an impartial jury, unawed by outside pressure, may under the law inflict upon him. He is a human being and is entitled to this. Let not an outraged public, or one which deems itself outraged, stain its own hands—stamp on its soul the sin of a great crime—on the false plea that it is but the avenger of the innocent."

The accused, being entitled to a trial by an impartial jury, is deprived of this right when the jury is overawed or coerced by outside influence, pressure, or conduct. The formulation of a maddened mob for the purpose of intimidating the court or jury, and thereby using the machinery of the law as an instrumentality for wreaking its vengeance upon the accused, is as unjustifiable as a direct resort to violence. The former is, perhaps, more reprehensible than the latter, as it is but an attempt to conceal the outrage with the cloak of a trial and judgment of a legal tribunal. The evidence not only discloses such conduct on the part of the mob as would overawe the average jury, but indicates that the entire atmosphere during the trial, from start to finish, was permeated with excitement, feeling, and a general determination to condemn and punish this defendant, regardless of his mental responsibility at the time of the unfortunate homicide. Indeed, it appears that the mob, during the progress of the trial, attempted to break the jail lock and get to the accused, being restrained by the valor and vigilance of the sheriff, and did not disperse, even after an admonition by several high officials, including the Attorney General, and after being assured that the trial would proceed the next morning, and much of this was seen or heard by the jury.

The judgment of the circuit court is reversed, and the cause is remanded.

Reversed and remanded.

All the Justices concur.