141 So. 201

## POWELL et al. v. STATE.

### 8 Div. 322.

Supreme Court of Alabama.
March 24, 1932.

Rehearing Denied April 9, 1932.

George W. Chamlee, Sr., and George W. Chamlee, Jr., both of Chattanooga, Tenn., and Joseph R. Brodsky, Irving Schwab, Allan Taub, Elias M. Schwartzbart, Joseph Tauber, and Sidney Schreiber, all of New York City, for appellant.

Thos. E. Knight, Jr., Atty. Gen., and Thos. Seay Lawson, Asst. Atty. Gen., for the State.

**KNIGHT, J.**

Ozie Powell, William Roberson, Andy Wright, Olen Montgomery, and Eugene Williams were jointly indicted, along with three others, by a grand jury of Jackson county, charging them, and each of them, with the offense of rape. The victim of their alleged offense was Victoria Price, a young white woman who lived at or near the city of Huntsville, in this state, and who, at the time of the commission of the alleged offense, was riding upon a freight train between Stevenson and Paint Rock, in Jackson county.

The trial of the appellants was had in the circuit court of Jackson county, on April 8, 1931, resulting in the conviction, of the defendants of the offense of rape, as charged in the indictment, and the imposition of the death penalty upon each. And on April 9, 1931, each of the defendants was sentenced to death in accordance with the verdict of the jury. These sentences were, upon motion of the defendants, suspended pending this appeal.

With respect to the appellant Eugene Williams, in addition to the matters presented for review and which are brought forward by each of the defendants, a further question is raised by this appellant growing out of, and based upon, the contention made by him that he was, at the time of his trial, under sixteen years of age, and that the circuit court of Jackson county therefore had no jurisdiction over him, or over his case. We will first consider the record with reference to any errors that may there appear, and which affect all the defendants, leaving the question that is presented upon age of appellant Williams to be later discussed and considered in this opinion.

The state's theory of the case is that the woman, Victoria Price, and her companion, Ruby Bates, had been on a trip to Chattanooga for the purpose of seeking employment; that on March 25, 1931, while these two women were returning to Huntsville, riding in a gondola car, attached to a freight train, and between Stevenson and Paint Rock, the defendants and other associates, all negroes climbed over and into this gondola car, engaged in a fight with seven white boys, who were riding in this gondola car with the two white women, and finally, after beating up and overpowering these white boys, either threw them bodily out of the car, or forced them to leave it; that the defendants then proceeded to rape both Victoria Price and Ruby Bates. Some five or six of the negroes, by force and threats, had intercourse with the said Victoria Price, while others, at the same time, ravished Ruby Bates. The testimony introduced by the state tended to support, and, if believed by the jury, did support, the above facts, and the state's testimony fur-

ther tended to show, and, if believed by the jury, did show, that after the defendants had gotten into the gondola car, and after they had expelled the white boys therefrom, one of the defendants seized the said Victoria Price, and proceeded to rape her, and, while he was doing this, one of the defendants, with knife open in hand and drawn, stood over the, prostrate form of Victoria Price threatening to kill her if she did not submit to the outrage then being perpetrated upon her, while some one of them held her by the legs. That six of the assailants on that occasion, by force, had intercourse with Victoria Price, and a number of them with Ruby Bates; and that all of the defendants took part in the raping of the two girls. The testimony for the state further tended to show that, while the girls were being ravished, the others of the defendants kept the white boys out of the car, and, to quote the language of Victoria Price, while on the stand, "telling them [the white boys] that they would kill them, that it was their car and we were their women from then on." The evidence for the state tended to show, and, if believed by the jury, did show, that each of the defendants either himself ravished the girl Victoria Price, or that each was present aiding and abetting those who did actually, and forcibly, have intercourse with her. If the two girls, Victoria Price and Ruby Bates, are to be believed, the defendants were guilty of a most foul and revolting crime, the atrocity of which was only equaled by the boldness with which it was perpetrated.

The defendants each denied on the stand that they, in any way, molested the girls, each in most positive terms denied that they had ravished her. One or more of them admitted that there was a fight between the white boys and the defendants, and that one of them had a pistol, and at least one of them had a knife.

We have deemed it best not to rehearse the testimony in detail in this case, as in many respects it is too revolting, shocking, to admit of being here repeated.

In this connection, however, we think it proper, now and here, to call attention to the fact that many of the utterances in the printed brief, and oral arguments addressed to this court of counsel for appellants, are not supported by the record submitted on this appeal in this case.

█ The indictment in this case is in the following language, omitting the caption: "The grand jury of said county charge that before the finding of this indictment Haywood Patterson, Eugene Williams, Charlie Weems, Roy Wright, alias Ray Wright, Ozie Powell, Willie Roberson, Andy Wright, Olen Montgomery and Clarence Norris, alias Clarence Morris, whose names to the grand jury are otherwise unknown than as stated forcibly ravished Victoria Price a woman, against the peace and dignity of the state of Alabama."

The sufficiency of this indictment was not tested by demurrer or otherwise, at any time before or during the trial. On motion for new trial, after conviction and sentence, the appellants for the first time question the sufficiency of the indictment. It will be noted that the indictment pursues the form prescribed in the Code (section 4556, form 88), and this court has uniformly held that indictments following the Code forms are sufficient. In the case of Jinright v. State, 220 Ala. 268, 125 So. 606, 607, this court was again called upon to consider, and to pass upon the sufficiency of an indictment prescribed by the Code, and it was there said:

"The power of the Legislature to prescribe the form of indictment is part of its general legislative power. Broadly speaking, it is curtailed only by constitutional limitations, such as the right of the accused to be informed of the nature and cause of the accusation, and to have a copy of same. Bill of Rights, § 6.

"The indictment must reasonably disclose an offense known to the law in force during the period covered thereby, and reasonably inform the accused of the accusation he is called upon to answer. Subject to these qualifications, statutory forms have from our early jurisprudence been held sufficient, although facts essential to a conviction may be omitted. Noles v. State, 24 Ala. 672, 692; Schwartz v. State, 37 Ala. 460, 466; Doss v. State, 220 Ala. 30, 123 So. 231 [68 A. L. R. 712]."

The indictment in the present case is not subject to the criticism that it is vague, indefinite, and uncertain. The nature and cause of the accusation are definitely stated, and the name of the woman, the subject of the crime, is set forth in the indictment. The form here used was approved by this court in the case of Leoni v. State, 44 Ala. 110. This decision was rendered by this court in 1870. and its correctness has not since been questioned, nor its soundness doubted. There is no merit in this contention of the appellants. Schwartz v. State, supra; Smith v. State, 63 Ala. 55; Whitehead v. State, 16 Ala. App. 427, 78 So. 467; Leonard v. State, 96 Ala. 108, 11 So. 307; Walker v. State, 96 Ala. 53, 11 So. 401; Lang v. State, 97 Ala. 41, 12 So. 183; Reeves v. State, 95 Ala. 31, 11 So. 158; Huffman v. State, 89 Ala. 33, 8 So. 28; Bailey v. State, 99 Ala. 143, 13 So. 566; Coleman v. State, 150 Ala. 64, 43 So. 715; Jinright v. State, 220 Ala. 268, 125 So. 606; Doss v. State, supra; Malloy v. State, 209 Ala. 219, 96 So. 57.

It therefore follows that no rights of the appellants under the State or Federal Con-

stitutions were ignored or invaded by reason of any supposed vagueness, indefiniteness, or uncertainty of the indictment. The terms of the indictment fully and sufficiently informed the defendants of the nature and cause of the accusation against them, and, in this regard, it fully complied with all requirements of the Federal and State Constitutions.

The indictment was returned into open court on March 31, 1931, duly authenticated by the signature of the foreman of the grand jury. This return is in all respects regular, and in accordance with law.

On March 31, 1931, after the return and filing of the indictment, the defendants, Haywood Patterson, Eugene Williams, Charlie Weems, Roy Wright, alias Ray Wright, Ozie Powell, Willie Roberson, Andy Wright, Olen Montgomery, and Clarence Norris, alias Clarence Morris, whose names are otherwise unknown than stated, attended by their counsel, came personally into open court, and were duly and legally arraigned, and pleaded "not guilty," and which plea was duly entered of record, and thereupon in open court, in the presence of the defendants, and their attorneys, the court set the trial of the cause for Monday, the 6th day of April, 1931, and, by due and proper order, ordered and directed that one hundred jurors be allowed as the venire from which to select the jurors for the trial of the cause, the said venire to consist of the seventy-five regular jurors drawn to serve as jurors for the week during which the cause was set for trial, and twenty-five jurors to be drawn from the jury box of Jackson county, and thereupon the said jury box was brought into court, and, after being well shaken, the court, in the presence of the defendants and their counsel, and according to law, publicly drew therefrom the names of twenty-five special jurors, in compliance with the order of said court to complete the venire for the trial of said cause. It also appears that the court, by proper order, directed that the sheriff summon all of said jurors, regular and special, to appear in court on the day the case was set for trial, and also to serve forthwith on defendants a list of all jurors so drawn, regular and special, together with a copy of the indictment in the case.

Thereafter, on April 4, 1931, the sheriff of Jackson county made his return to the court showing that he had fully and completely complied with said above order of the court. It thus appears that every step in the proceedings in said cause was regular, and according to law, as respects the indictment, the return thereof into court, the arraignment of the defendants thereon, the setting of a day by the court for the trial of the cause, the order for a special venire, the drawing of the same, and the service of a list of the jurors upon the defendants, together with a copy of the indictment.

Section 5570 of the Code provides: "When two or more defendants are jointly indicted, they may be tried, either jointly or separately, as either may elect."

At common law, it was within the sound discretion of the court, whether the trial would be joint or several. Section 5570 of the Code confers on the defendants the unqualified right to elect and demand separate trials. In the case of Whitehead v. State, 206 Ala. 288, 90 So. 351, it is held that, where two or more defendants are jointly indicted, and they do not demand a separate trial, then, whether the trial shall be separate or joint, rests in the sound discretion of the court. This has been the uniform holding of this court through the years, and, in ordering a severance in the case, the court but exercised a discretion confided to it by the common law, and not abrogated by statute.

The complaint of appellants at this action of the court can avail them nothing. And besides, no objection was made thereto and no exception was reserved. Jackson v. State, 104 Ala. 1, 16 So. 523; Wright v. State, 108 Ala. 60, 18 So. 941; Wilkins v. State, 112 Ala. 55, 21 So. 56; Charley v. State, 204 Ala. 687, 87 So. 177.

This brings us down to a consideration of appellants' motion for a change of venue in the cause, which was made by the appellants, and overruled by the court upon consideration of the motion, and the evidence offered in support thereof, and counter proof offered by the state.

In their petition or motion, the appellants represented to the court: "That they nor either of them can have a fair and impartial trial in this county; that the newspapers published in this county have so persistently tried the cause asserting the guilt of defendants in such terms, as to influence the public mind to the extent that the sheriff of said county had the Governor of this State to call out the National Guards to protect the lives of your petitioners. That after the arrival of said troops, hundreds of people gathered about the jail, where they were confined, apparently in threatening manner. That from the inflammatory statements contained in said newspapers, which are circulated all over this county, the mind of the public is such that your petitioners could not have a fair and impartial trial. A copy of which publications are hereto attached marked Exhibits 'A' and 'B' and made a part of this petition. Wherefore, petitioners pray your honor to make an order removing this trial to some other county and defendants make oath that all the foregoing statements are true." This motion is sworn to by each of the nine defendants.

It will readily appear from the motion or petition that the main or chief ground of

apprehension that defendants could not secure a fair and impartial trial was due to newspaper accounts of the affair, published in the Jackson County Sentinel, a newspaper published at Scottsboro, the county seat of Jackson county. That the publications of the accounts of the affair inflamed the public mind to the extent that the sheriff had the Governor of Alabama to call out the National Guard to protect the defendants, and that, upon the arrival of the troops, "hundreds of people gathered about the jail, where they were confined, apparently in a threatening manner." It will be observed, however, that the petition does not charge that any actual violence, or threatened violence, was offered the prisoners, or any one of them. Nor does it anywhere appear that the "hundreds of people who gathered about the jail" were armed, or disorderly in any wise, or to any extent. That the crime of which the defendants were charged was one calculated to arouse the people of any community, county, or state, cannot be denied; that it was news that newspapers, *the world over*, would print and convey to their readers must also be borne in mind. Newspapers, observing due proprieties, have the right to keep the public informed of the happenings throughout the country. Such is the sphere and scope of their enterprise. They exist for the purpose, and sole purpose, of conveying to the public the happenings of the day, whether it be of crimes committed, or of events in the social world, or of matters of commerce or business. So long as they exist, we may expect them to carry accounts of crime committed, not only within the radius of their circulation, but elsewhere. Accounts of crime committed on the other side of the Atlantic often appear in the press on this side within a few hours after it has happened—the extent of the accounts varying with the atrocity of the crime.

■■■ In the case of Godau v. State, 179 Ala. 27, 60 So. 908, 910, this court had occasion, on consideration of the application made by the defendant in the lower court for change of venue, based in part on newspaper publications, to give expression to some principles of law here applicable, and it was there said: "So long as we have newspapers we may expect to have through them the report of crimes, and it is not to be unexpected that, when a homicide is committed and discovered under circumstances like the present—even if the defendant's account of the entire matter is the truth—the newspapers of the community, answering the public interest, will furnish the defendant with at least some material upon which to base an application similar to the one under discussion." But newspaper accounts, of themselves, cannot be made the sole basis for a change of venue. It must be made to reasonably appear to the judicial mind that these accounts have, by their circulation, so molded and fixed the *public opinion* as to make it proper that the cause should be removed to some other locality not so affected for trial.

In the case of McClain v. State, 182 Ala. 67, 62 So. 241, 243, it appears from the original record that Jacob Lutes and his wife, Marcella, were murdered in their home on the 6th or 7th of November, 1911. The murder was committed with a hatchet, and was most brutal and bloody in the manner and circumstances of its execution, and was followed by robbery of the murdered couple of a considerable sum of money. This murder was followed by great public excitement and indignation, and extraordinary activity by officers and citizens looking to the prompt discovery and punishment of the perpetrators of the crime. Hundreds of people from St. Clair and Etowah counties hurried to the scene. The discussion of the crime was constant and general throughout both counties both among the people and in the newspapers. About two thousand people were in Ashville during the preliminary trial, and heard or were informed of the testimony, and of the alleged confession of one of the defendants; and a full report of the evidence, on the preliminary trial, was published in the local and in the Gadsden daily papers, with sensational headlines and comments, and with repeated statements that defendants were undoubtedly guilty, with one statement that the defendant was regarded as the ringleader. Numerous exhibits of the newspaper reports were attached to, and made a part of, the motion for a change of venue from St. Clair county, the county in which the crime was committed. These newspaper reports were equally as sensational and damaging as are the reports attached to the petition in the instant case, but, like the present case, they disclosed no actual violence offered to defendants, and no disposition was exhibited to take the law into their own hands by the citizens. Commenting upon these newspaper reports, Mr. Justice Somerville remarked:

"It may be fairly asserted that these conditions accompany or follow the commission of all very brutal crimes in whatever community they may occur. It is certain, also, that newspaper reports of such crimes, accompanied by sensational comments and denunciations of the accused, are likely to inflame the sentiments of certain classes of the people and to engender in their minds a passive conviction, more or less permanent, of the guilt of the accused.

"We are not prepared to concede, however, that the sensational language of a newspaper reporter or special correspondent used in 'writing up' such cases as this may be safely taken as a reflection of general public sentiment; nor that it may be lightly assumed that such statements as those here

shown are capable of permanently molding and fixing the opinions of the more intelligent classes of the people to the extinction of their sense of fair play, and the suppression of their sober second thought."

Most people, of fair judgment, are honest in their convictions, and do not arrive at convictions, where life and death are at stake, until after due consideration of the facts of the case. And we may also add that, under the laws of Alabama, only such classes are permitted in the jury boxes of the state.

In the McClain Case, supra, the court, following the directions of the Act of August 26, 1909, now section 5579, Code, after full consideration of the petition for change of venue, and the proof submitted in support of it, upheld the ruling of the circuit court of St. Clair county, overruling the petition and denying to the defendant a change of venue. In that case, this court, in affirming the case, used this presently pertinent language: "Under the principles and reasoning stated in the recent case of Godau v. State, 179 Ala. 27, 60 So. 908, not unlike this in its material aspects, we are constrained to hold that the trial court did not err in overruling the application. We have considered its merits de novo, as required by the amendatory act of August 26, 1909 (Acts Sp. Sess. 1909, p. 212), and we are not reasonably satisfied that it should have been granted."

It is insisted that the publications made exhibits to the application inflamed the public mind to the extent that the sheriff of said county had the Governor to call out the National Guard to protect the lives of the petitioners. The testimony offered upon the hearing of the petition does not support the statement as to the inflamed condition of the public mind, or that it was necessary to assemble the National Guard to protect the prisoners from threatened violence. In this connection, it should be stated that the judge of the court did not direct the sheriff to call for the militia, nor did the judge of the court make any request upon the Governor for the militia. The sheriff requested the presence of the guard, on his own initiative, out of abundance of precaution, and, we may assume, realizing the gravity of the charge against the prisoners. Up to the time the call was made, no violence had been offered any of the prisoners, and, so far as the testimony discloses, no violence was threatened them. There was, as the testimony shows, quite a large crowd in Scottsboro during the trial, made up not wholly of Jackson county citizens, but of citizens of other counties. We can well understand that such a happening, made the basis of the charge against the defendants, was calculated to draw to Scottsboro, on the occasion of the trial, large crowds. It would be surprising if it did not. But that does not mean that the gathering was for the purpose of wreaking summary vengeance upon the defendants. It will be noted that, in the application for change of venue, it is stated "that after the arrival of said troops, hundreds of people gathered about the jail, where they [defendants] were confined, apparently in a threatening manner." There is absent from this record a single statement of fact which tends to show in the remotest degree any offer of violence to the defendants, and, as for that, any threatened violence.

In support of the application for change of venue, the defendants called as witnesses and examined, ore tenus, the sheriff and Major Starnes, the commanding officer of the unit of National Guard ordered to Scottsboro by the Governor. The sheriff's testimony throws much light upon the situation prevailing at Scottsboro during the period of this trial, and the cause or causes leading up to, and culminating in, his calling upon the Governor for the dispatch of a unit of the National Guard to that place.

The sheriff, while testifying that he had asked for the National Guard to protect the defendants, also testified, "It was more on the grounds of the charge that I acted in having the guards called than it was on any sentiment I heard on the outside. I have not heard anything as intimated from the newspapers in question that has aroused any feeling of any kind among a posse. It is my idea, as sheriff of this county, that the sentiment is not any higher here than in any adjoining counties. I do not find any more sentiment in this county than naturally arises on the charge. I think the defendants could have as fair trial here as they could in any other county adjoining. From association among the population of this county, I think the defendants could have a fair and impartial trial in this case in Jackson County. That is my judgment. I have heard no threats whatever in the way of the population taking charge of the trial. It is the sentiment of the county among the citizens that we have a fair and impartial trial."

The defendants, in support of their application for change of venue, also called, had sworn, and examined Major Starnes, who was in charge of the units of the National Guard on duty at Scottsboro during, and before, the trial of the defendants. Major Starnes testified that he was the commanding officer of the National Guard at Scottsboro, and that he had made three trips to that place. With reference to the feeling prevailing at Scottsboro at the time these defendants were brought up for trial, we quote, in part, the testimony given by Major Starnes to the court, on the hearing of the defendants' application for a change of venue: "I first came here, of course, under orders from the Governor, and I have been here under his orders ever since. This is the third trip I have made

here from Gadsden. **In my trips over to Scottsboro in Jackson County and my association with the citizens in this county and other counties, *I have not heard any threats made against any of these defendants.* From my knowledge of the situation gained from these trips over here, I think these defendants *can obtain here in this county at this time a fair and impartial trial and unbiased verdict. I have seen absolutely no demonstration or attempted demonstration toward any of these defendants.* I have seen a good deal of curiosity but *no hostile demonstration.* In my judgment the crowd here was here out of curiosity, and not as a hostile demonstration toward these defendants.** (Italics supplied.)

The accounts published in newspapers, and which were introduced in evidence, while condemning in strong terms the crime, alleged to have been committed against two defenseless white girls, did not advocate violence against the defendants, but rather appealed to the citizenship of Jackson county for a fair trial for the defendants, and for an opportunity for the facts of the case to be tried by a jury. The character of the crime was such as to arouse the indignation of the people, not only in Jackson and the adjoining counties, but everywhere where womanhood is revered, and the sanctity of their persons is respected. That many should have been attracted to Scottsboro during the days covered by the trial, and the preliminaries incident thereto is no small wonder, considering the character of the crime charged against the defendants. The alleged victims were not citizens of Jackson county, and it is more than possible that they were not known to a citizen of that county, but they were, if the testimony is to be believed, two young white women, unknown, and entirely defenseless. No matter whether their sins were as scarlet, it neither gave justification nor excuse to any man to lay a violent hand upon them, or to force them to submit against their will, to the violation of their persons. The record of facts in this case, notwithstanding the atrocity of the crime charged, does not disclose a single act done by the populace to show a disposition to take the law into its own hand. If the record truly gives the facts in the case, and we have no right to doubt it, the defendants at no time were in danger of mob violence, and it wholly fails to show that the court, jurors, or officers were inflamed against the defendants. To the contrary, considering the nature of the crime and its revolting features, the people seem to have conducted themselves with a commendable spirit and a desire to let the law take its due course.

The burden of proof was upon the defendants to show that they could not get a fair and impartial trial in Jackson county, before the court would have been justified in granting the change of venue moved for. In the case of Malloy v. State, 209 Ala. 219, 96 So. 57, 58, this court, in an opinion written by Justice Miller, said: "When the defendant makes application for a change of venue, the burden rests on him to show 'to the reasonable satisfaction of the court that an impartial trial and an unbiased verdict cannot be reasonably expected' in that county where the indictment was found. Seams v. State, 84 Ala. 410, 4 So. 521."

The defendants have vigorously pressed upon our attention the case of Thompson v. State, 117 Ala. 67, 23 So. 676, as an authority not only justifying, but requiring, that this court should reverse the lower court in refusing the defendants' application for a new trial. A careful reading of the facts in the Thompson Case, supra, will disclose that this insistence is not well taken.

In the Thompson Case, supra, which was a case in which the offense charged was rape, it was made to appear to the court by "affidavits and other evidence that the public were so greatly aroused against the defendant that it required the promptest and most vigorous action of the executive officers of the state from the governor down, and including the military, *to protect the defendant* from *mob violence* and summary execution," and that the feeling continued down to and through the trial. No such state of facts is shown in this case, and no such disposition on the part of the public was exhibited against these defendants at Scottsboro.

Much has been said in brief and oral argument by counsel for appellants about the case of Moore et al. v. Dempsey, Keeper of the Ark. State Penitentiary, 261 U. S. 86, 43 S. Ct. 265, 67 L. Ed. 543, in which the opinion was written by Justice Holmes, and in which Justices McReynolds and Sutherland dissented.

It requires no close scrutiny to see, and no argument to demonstrate, that there is no parallel between the facts of that case and the case now under consideration. By no stretch of the imagination can it be said that the case under consideration resembles, in the remotest degree, in any of its salient facts, the facts made the basis for habeas corpus, in the Moore Case, supra.

The case of Downer v. Dunaway (C. C. A.) 53 F.(2d) page 586, is cited in support of appellants' contention that they should have been granted a change of venue. We have carefully read the report of this case. The facts superinducing the majority opinion written by Judge Bryan in that case are so unlike the facts in the instant case, and the circumstances attending that trial so different in all essential features, that it is not an authority in point. Any one reading the facts in the two cases would see, and comprehend,

that the cases are wholly dissimilar, and in no true sense can the decision in the Downer Case, supra, be said to support the contention of appellants in this case.

■ Observing the plain mandate of section 5579 of the Code, but without conceding that the Legislature had the right to so legislate, we have carefully considered the application, and the evidence submitted in support thereof, of appellants for a change of venue, without indulging any presumption in favor of the judgment and ruling of the lower court on said application. The burden of proof was on the defendants to show to the reasonable satisfaction of the court that a fair and impartial trial could not be had in Jackson county. This burden of proof appellants did not, in our opinion, meet and discharge. The evidence fails to show that their trial was dominated by a mob or mob spirit, or that there was at any time any mob present at, or during, the trial, or that the jury was inflamed against the defendants to the point where they could not, or did not, give the defendants a fair and impartial trial; nor does the evidence show there was any violence, actual or threatened, against the defendants, from the time of their arrest to the conclusion of their trial.

We are at the conclusion that the lower court committed no error in overruling appellants' motion for a change of venue. Baker v. State, 209 Ala. 142, 95 So. 467; Malloy v. State, 209 Ala. 219, 96 So. 57; Godau v. State, 179 Ala. 27, 60 So. 908; Adams v. State, 181 Ala. 58, 61 So. 352; McClain v. State, 182 Ala. 67, 62 So. 241; Hawes v. State, 88 Ala. 37, 7 So. 302; Byers v. State, 105 Ala. 31, 16 So. 716; Gilmore v. State, 126 Ala. 20, 28 So. 595; Riley v. State, 209 Ala. 505, 96 So. 599; Hendry v. State, 215 Ala. 635, 112 So. 212.

■ There is no merit in the exception reserved by the defendants to the action of the court with reference to a special venire for the trial of the defendants. The record proper shows, as heretofore pointed out, that these defendants, along with their codefendants, and before any severance was granted, appeared in open court, attended by counsel, and were each, along with their codefendants—nine in number—in open court duly and legally arraigned upon the indictment, pleaded not guilty; and the court, then and there pursuant to the statute, set a day for the trial, and ordered that the venire for their trial should consist of one hundred jurors, to be composed of the seventy-five regular jurors drawn for the week of the trial, and twenty-five special jurors to be drawn, as the law directs, in open court, by the presiding judge from the jury box of Jackson county. This was done in all respects according to the statute, in such cases made and provided, and a list of these one hundred jurors, by

order of the court, together with a copy of the indictment, was served upon each of the defendants. This was a strict compliance with the law of the case. Code, § 8644. And, besides, section 8649 provides: "Whenever the judge of any court trying capital felonies shall deem it proper to set two or more capital cases for trial *on the same day,* said judge may draw and have summoned one jury or one venire facias of petit jurors for the trial of all such cases so set for trial on the same day." (Italics supplied.)

This section, as was the manifest purpose of the Legislature, removed the necessity of drawing a special venire for each capital case set for trial on the same day. But, be this as it may, when the court ordered and allowed a special venire of one hundred jurors to try this case, it stood upon the docket as one case, and against these defendants, as well as against their codefendants. It results that appellants can take nothing by this exception, as the record affirmatively shows that the court had given them a special venire consisting of one hundred jurors, the maximum allowed by law. Code, § 8644.

■■ During the progress of the trial only two exceptions were reserved by the defendants to the rulings of the court on admissions of evidence. While Sim Gilley was on the stand, testifying on behalf of the state, and after he had testified that he was "one of the boys on the train that day"—referring to the day on which the alleged rape occurred—and that he saw all the negroes in that gondola, he was asked by counsel for the state, "How many in that row there, look at that row of five sitting on the front—get up and walk over there if you cannot see them?" The defendants separately objected to the question, upon the grounds "it was immaterial, irrelevant, illegal and incompetent, and because it was reopening of the case." The court overruled this objection, and defendants duly excepted. The evidence was clearly admissible. Whether it was in rebuttal, strictly speaking, we cannot affirm, but, if not, the propriety of admitting it was addressed to the sound discretion of the court. There was no error in this ruling of the court.

■ After the witness had testified that he saw "every one of those five in the gondola," counsel for the state thereupon propounded this question to the witness Gilley: "Were the girls in there?" The defendants separately objected to that question, the court overruled it, and defendants duly excepted. The objection was, without merit. The question called for relevant, material and competent testimony.

■ It was clearly within the discretion of the court to allow counsel for the state to have a second argument, although defendants' attorneys had declined to make argument. Southern Bell Tel. & Tel. Co. v. Miller, 192

550

Ala. 346, 68 So. 184; Mobile & M. Ry. Co. v. Yeates, 67 Ala. 164; Hall v. State, 216 Ala. 336, 339, 113 So. 64; Sheppard v. State, 172 Ala. 363, 55 So. 514.

After the verdict was rendered against the defendants, they filed motion for new trial on the 9th day of April, 1931, and thereafter amendments to the motion were made, and filed in the cause.

It is not necessary to a proper understanding that the motion be set out at length. The principal argument in support of the motion relates to motion for a change of venue which in the main has been heretofore treated in this opinion.

██ It is insisted, among other things, that the demonstration made when the other verdict or verdicts were brought in greatly prejudiced their case. There was considerable testimony offered on this phase of the case, and it does not support appellants' contention. A number of the jurors testified on the hearing of the motion, and it does not appear that the appellants' cause was prejudiced by any alleged demonstrations. Certain it is also that defendants never, at any time, made any objection or reserved any exceptions to anything that occurred with reference to demonstrations or applause. Nor does it appear that the court failed promptly to suppress any misconduct that came to its notice. We hold that no error is made to appear from the ruling of the court on defendants' motion for a new trial based on the above ground. Hendry v. State, 215 Ala. 635, 112 So. 212.

██ It is also insisted by defendants that a new trial should have been granted them, because, inter alia, they were not given time to prepare their cases for trial. No motion for a continuance appears in the record. Therefore, this contention cannot avail defendants, made for the first time after verdict. Application, based upon proper grounds, should have been made to the court before the trial was entered upon.

██ It is also urged that the defendants are entitled to a new trial because the court erred in not interrogating, and in failing to qualify, the trial jurors as to race prejudice, and as to whether or not they could and would, in view of the fact that the defendants were negroes, and the complainant and prosecuting witness a white woman, give the defendants a fair, impartial, and unprejudiced trial, etc. It should suffice to say that the court will not be put in error for not assuming that there exists here in Alabama, and particularly in Jackson county, racial prejudices. No doubt, had counsel for the defendants assumed such to exist, and had, acting upon such assumption, requested the court to interrogate the jurors on that subject, the court would have complied with their request.

██ It is also insisted, however, for the first time on motion for new trial, that "exclusion· of negroes from the list of jurors," from which defendants' jury was drawn, was a denial of the defendants' rights under the Constitution of the United States, Amendment 14, § 1. It should suffice to say that the defendants made no objection whatever to the venire upon any such ground, nor does the record, in point of fact, sustain any such contention. Having made no objection to the personnel of the jury on account of race or color, the defendants are in no position to put the court in error, in the contention made for the first time on motion for new trial. By failing to object to the personnel of the jury, the defendant must be held to have waived all objections thereto. Batson v. State, 216 Ala. 275, 113 So. 300; Herndon v. State, 2 Ala. App. 118, 56 So. 85; Carson v. Pointer, 11 Ala. App. 462, 66 So. 910; 20 R. C. L. 241; 18 L. R. A. 475, Note; 68 L. R. A. 885, Note; 16 Corpus Juris 1156; Eastman v. Wight, 4 Ohio St. 156; State v. Jones, 89 S. C. 41, 71 S. E. 291, Ann. Cas. 1912 D, 1298; Ryan v. Riverside, 15 R. I. 436; 8 A. 246; Stewart v. Ewbank; 3 Iowa, 191; State v. Whiteside, 49 La. Ann. 352, 21 So 540; Ferrell v. State, 45 Fla. 26, 34 So. 220; Whitehead v. State, 206 Ala. 288, 90 So. 351.

██ Without regard, however, to the foregoing, there is no merit in the appellants' above-stated contention. The state of Alabama has the right, within· constitutional limitations, to fix qualification for jurors. Thomas v. Texas, 212 U. S. 278, 29 S. Ct. 393, 53 L. Ed. 512. The jury laws of Alabama do not exclude any man from jury service by reason of race or color. The qualifications of jurors are fixed and defined by section 14, Acts of Legislature of Alabama 1931, pages 55 et seq., and by this act the jury board is required to place on the jury roll and in the jury box the names of "all male citizens of the county who are generally reputed to be honest and intelligent men and are esteemed in the community for their integrity, good character and sound judgment." The jury boards of the state are required to observe these positive requirements of the statute, and there is nothing in the record to show that the jury board of Jackson county failed of their duty in any respect with reference to the jury roll or jury box in that county. The contention of the appellants in the respect here pointed out is without merit. Ragland v. State, 187 Ala. 5, 65 So. 776.

██ It is also urged upon our attention that the trial court committed reversible error in not granting defendants a new trial because of newly discovered evidence. It is insisted earnestly that they should have had an opportunity to prove that the said Victoria Price had the reputation of being a common prostitute. There was no evidence

offered to show that she had ever had intercourse with negroes. This evidence could only be admissible as tending to show consent. The entire theory of defendants' case was that they had not touched the woman, and had no intercourse with her. The question of consent, vel non, was not therefore an issue in the case. The evidence was wholly irrelevant to any issue in the case as presented and tried. Rice v. State, 35 Fla. 236, 17 So. 286, 48 Am. St. Rep. 245.

■ It is insisted that the defendants were put to trial so soon after the alleged commission of the offense that they were unable to prepare their defense, and at a time when the public mind was so inflamed that they could not secure a fair and impartial trial.

Article 6, of Amendments to Constitution of the United States, provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence."

And section 6 of the Constitution of Alabama secures to all persons, within her territorial limits, the same fundamental and constitutional rights.

The record before us fails to show that any right guaranteed to the defendants under the Constitution of the United States or of the state of Alabama was denied to the defendants in this case; on the contrary, the record shows that every such right of the defendants was duly observed, and accorded them.

The appellants complain of the speed of the trial. There is no merit in the complaint. If there was more speed, and less of delay in the administration of the criminal laws of the land, life and property would be infinitely safer, and greater respect would the criminally inclined have for the law.

On the 6th day of September, 1901, at 4:07 p. m., in the city of Buffalo, in the state of New York, Czolgosz, an assassin, fired two bullets into the body of the then most illustrious and beloved man in the United States, President William McKinley. This foul crime was committed in the presence of thousands of the citizens of Buffalo. The crime shocked and aroused the indignation of people everywhere. Within less than ten days after the burial of Mr. McKinley, the murderer was placed on trial for his life, in the city of Buffalo, where the crime was committed. It is recorded that the trial was pre-

sided over by Judge Truman C. White, "one of the oldest and most experienced of the Supreme Court justices." It required "exactly eight hours and twenty-six minutes" to conclude the trial, and it is further recorded that "in less than one hour after Justice White began his charge to the jury, the verdict of 'guilty' was brought into court." On October 29, 1901, less than two months after the crime was committed Czolgosz, the murderer, was executed for his crime. This verdict, sentence, and execution were approved by good citizens, north, south, east and west, in fact on both sides of the Atlantic.

True this Czolgosz verdict was rendered in a case where a human life had been taken in a most dastardly manner. But we are of the opinion that some things may happen to one worse than death, at the hands of an assassin, and, if the evidence is to be believed, one of those things happened to this defenseless woman, Victoria Price, on that ill-fated journey from Stevenson to Paint Rock, on March 25, 1931.

■■ As to the defendants Ozie Powell, William Roberson, Andy Wright, and Olen Montgomery, we find no errors in the record, and none as to defendant Eugene Williams unless it be on account of the asserted fact that he was, at the time of his trial, under sixteen years of age. This we will now proceed to consider. The question presented is not without its difficulties, due to the fact that our statutes on the subject of juvenile delinquents do not furnish rules of procedure by which such delinquents, when indicted for crime, and brought before a court of competent jurisdiction for trial, on such indictments, shall present to the court the fact that they are under the age of sixteen years, and, therefore, not subject to trial upon such indictment. Courts must follow the plain, positive, and unambiguous provisions of the statutes, whether rules for their guidance in such cases are given along with such statutes or not, and they may prescribe, for their procedure, such reasonable rules and regulations, not inconsistent with the statute, as may be deemed reasonable and proper.

The presently pertinent sections of the Code dealing with juvenile delinquents, and the disposition of cases in which such delinquents are brought before the courts, are found in sections 3528, 3529, and 3539. Section 3528 defines juvenile delinquents. Section 3529 confides to the courts of probate, except in the several counties of the state in which special courts have been given exclusive jurisdiction over children under sixteen years of age, original and exclusive jurisdiction of all proceedings coming within the provisions and terms of chapter 100, dealing with juvenile delinquents; and it confers upon such probate courts *original* and *exclusive* jurisdiction to hear, determine, and ad-

judicate *all questions* and cases falling or coming within the provisions of said statutes. To this extent jurisdiction in the circuit court is denied, or excluded. Section 3539 provides: "Nothing in this chapter shall be construed as forbidding the arrest, with or without warrant, of any child as is now or may hereafter be provided by law, or as forbidding the issuance of warrants by magistrates as provided by law. Whenever a child under sixteen years of age is brought before a magistrate of any court in the county other than the juvenile court, charged with any offense, such magistrate or court shall forthwith, by proper order, transfer the case to the juvenile court of the county. Any criminal court or any court exercising criminal jurisdiction in any county coming under the provisions of this chapter before which any child between the ages of sixteen and eighteen years is brought, charged with the commission of a crime, shall have authority, if such court shall deem it to be in the interest of justice and of the public welfare, to in like manner transfer such child by proper order to the jurisdiction of the juvenile court of said county to be dealt with as a delinquent child under the terms of this chapter and when so transferred such child shall come under all terms and conditions of this chapter and be so dealt with as other children are dealt with under this chapter. All information, depositions, warrants, and other processes in the hands of such magistrates or court shall be by him or by the judge of said court forthwith transmitted to the juvenile court and shall become a part of the records of the juvenile court. The juvenile court shall thereupon have jurisdiction of the cause and shall proceed to hear and determine the case so transferred to it, in the same manner as if the proceedings had been instituted in the juvenile court by petition as hereinbefore provided."

Our statute upon the subject of juvenile delinquents are not unlike the laws on the same subject in a number of other states. The general provisions of our statutes are very similar to the statutes, on the same subject, in Kentucky and Tennessee.

In the case of Sams v. State, 133 Tenn. 188, 193, 180 S. W. 173, 174, the question now before this court received the attention of the Supreme Court of Tennessee. In that case (Sams) the plaintiff in error was indicted for a criminal offense. To the indictment he filed a plea raising the question that the circuit court was without jurisdiction to try him upon the charge, inasmuch as he was under sixteen years of age. This plea on motion of the state was stricken. There was a jury and verdict of guilty, and sentence of the court thereon. It then appears in the minute entry that defendant filed motion in arrest of judgment. This motion was overruled by the court, defendant excepting. On appeal to the Supreme Court, the court observed: "But the most difficult question in the present case is how plaintiff in error shall be dealt with in the circuit court upon the remand of the cause; in other words, what is the jurisdiction of that court in respect of the charge in the indictment set out against this particular plaintiff in error under the facts of this case and our existing statutes."

Continuing, this court further observed: "The question of the jurisdiction of the circuit court is directly presented in this cause, when we come to consider the assignment of error based on the action of the court in overruling the motion in arrest of judgment. That motion was based on the lack of jurisdiction in the circuit court. The court could then see from the proof in the cause that plaintiff in error was under the age of 16 years at the time of his arrest, and indeed under such age at the time of the court's action on the motion in arrest of judgment, and of course under such age at the time the indictment charged the offense to have been committed. These facts clearly appeared without dispute in the evidence which had been introduced before the jury."

Continuing the court said: "When these facts appeared to the trial court, it should have sustained the motion in arrest of judgment, for the reason that, under chapter 58, Acts 1911, plaintiff in error was a 'delinquent' child within the meaning of section 1 of that act. That section defines a delinquent child under the age of 16 years who violates any law of the state."

The court in the Sams Case, supra, held that the motion in arrest of judgment should have been sustained, and the trial court should have transferred the case to the juvenile court.

In the case of Talbott v. Commonwealth, 166 Ky. 659, 179 S. W. 621, under statutes almost identical with our own, the Supreme Court of Kentucky held that, as the circuit court was without jurisdiction of the person of the defendant (he being under sixteen years of age), the question could be made at any time, and was available for reversal, even though the question was raised for the first time in this court on appeal. It therefore results that this defendant did not lose the right to raise the question because of his failure to do so during the progress of the trial.

This question again came before the Supreme Court of Kentucky, in the case of Mattingly v. Commonwealth, 171 Ky. 222, 188 S. W. 370, and the court again reaffirmed the conclusion and holding in the Talbott Case, supra.

The Court of Appeals of Alabama, in the case of Hart v. State, 22 Ala.-App. 135, 113 So. 471, held that, where the defendant was un-

der sixteen years of age, the trial court, under existing statutes, was without authority to pronounce judgment of conviction against him, being without jurisdiction of the person of the defendant. other than to forthwith, by due and proper order, transfer the case to the juvenile court of the county.

In support of the motion of appellant Eugene Williams for a new trial, based on the ground that he was under sixteen years old, when brought before the court for trial, are the affidavits of three persons who claimed to have known him from his birth. They swear that he was born on December 6, 1916, and that affiants were living with this defendant's mother when he was born. In opposition to this evidence, no proof was offered by the State, so far as the record shows. While these affidavits may be false, yet there is nothing in this case to show their falsity. It also appears that the age of this defendant was brought to the attention of the court before the trial was entered upon.

Since the statute declares a juvenile delinquent the ward of the state, it became the duty of the trial court, upon suggestion that the defendant Eugene Williams was under sixteen years of age, or if his personal appearance suggested a doubt as to his age, to ascertain his age, and, if found to be under sixteen years of age, to transfer the cause as to said defendant Eugene Williams to the probate court, as the juvenile court of Jackson County. Code, §§ 3529, 3539.

If the probate court, as the juvenile court of Jackson county, upon due investigation or trial of disciplinary measures in the institution provided for the purpose, becomes convinced such delinquent cannot be made to lead a correct life and cannot be properly disciplined, he has authority to retransfer the cause to the circuit court to be tried as other cases. Code, § 3540; Berry v. State, 209 Ala. 120, 95 So. 453.

Under the plain mandatory terms of the statute, the state offering no testimony to show that the defendant was sixteen years of age, or over, it became and was the duty of the court to grant this defendant a new trial on this ground of his motion, and none other. In failing to do so, the court committed error, as to the appellant Eugene Williams, necessitating a reversal of this cause as to said appellant Eugene Williams.

There are no errors in the record as to the other appellants, viz., Ozie Powell, Willie Roberson, Andy Wright, and Olen Montgomery, and the cause as to them will be here affirmed. Agee et al. v. State, 190 Ala. 19, 67 So. 411. As to the appellant Eugene Williams, the cause is reversed, with directions to the court below to ascertain, by proper evidence, the age of defendant Eugene Williams before again putting this defendant on trial,

and, if it be ascertained that he is under sixteen years of age, that he be transferred to the juvenile court of Jackson county, to be there dealt with as a juvenile delinquent, pursuant to the statute, in such cases made and provided.

The several matters which impel Chief Justice ANDERSON to dissent, as shown by his dissenting opinion, have received the careful consideration of the court in conference.

The speedy trial and presence of the military seems to be regarded as enough to have a coercive influence on the jury. We cannot approve the idea that speedy trials should not be had because the gravity of the charge is such as to arouse public interest and indignation. The presence of the militia, instead of having a coercive influence on the jury, was notice to everybody that the strong arm of the state was there to assure the accused a lawful trial. Any good citizen would interpret this to mean a fair trial in which the guilt or innocence of defendants should be determined on the evidence and punishment meted out accordingly.

We would consider it a dangerous precedent to declare that, because, out of abundance of caution in cases of this character, it was deemed best to have militia present, safeguarding the prisoners, this should furnish a ground for setting aside the verdicts of juries and granting a new trial. As stated in the opinion, not only is there a lack of evidence that the citizenship of Jackson county intended other than a legal and fair trial of these cases, but direct evidence that such was the general expression.

Touching alleged applause upon a return of the verdict in one of the cases, we have noted evidence negativing any prejudicial effect; but we would now make it plain that affidavits prepared and submitted on this line on the motion for a new trial related to matters occurring on the main trial and in the presence of the court hearing the motion. The bill of exceptions, prepared by experienced counsel now appearing, is entirely silent as to what did occur. The bill of exceptions made up under the safeguards of law is the method of presenting such matters.

The trial judge was under the duty to consider affidavits, if at all, in the light of his own knowledge of such incidents. If these affidavits did not accord with his own knowledge, it was his duty to disregard them.

Under all the rules sustaining the trial judge unless error affirmatively appear, his ruling on this question is not presented for review.

We think it a bit inaccurate to say Mr. Roddy appeared only as amicus curiæ. He expressly announced he was there from the beginning at the instance of friends of the accused; but not being paid counsel asked

to appear not as employed counsel, but to aid local counsel appointed by the court, and was permitted so to appear. The defendants were represented as shown by the record and pursuant to appointment of the court by Hon. Milo Moody, an able member of the local bar of long and successful experience in the trial of criminal as well as civil cases.

We do not regard the representation of the accused by counsel as pro forma.

A very rigorous and rigid cross-examination was made of the state's witnesses, the alleged victims of rape, especially in the cases first tried. A reading of the records discloses why experienced counsel would not travel over all the same ground in each case.

Whether benefit or hurt would have attended an effort to present an argument for the accused is purely conjectural.

 It is a recognized rule that, if manifest error appear, an appellate court is not primarily concerned with the guilt of the accused, but merely the question of a fair trial under the rules of law. But when we come to consider the granting of a new trial on account of atmosphere as affecting the verdict, we think the manifest and obvious guilt of the accused is to be regarded.

We think in such case the finding of the jury and the action of the trial court should be credited to a conviction of duty under the evidence; while in a very 'doubtful case the question of coercive influence should be carefully scrutinized.

We cannot, therefore, agree with the CHIEF JUSTICE that these cases should be reversed on the grounds set out in his opinion.

And it appearing to the court that the day fixed by the circuit court of Jackson county for execution of the death sentence imposed by that court upon the said defendants, Ozie Powell, Willie Roberson, Andy Wright, and Olen Montgomery, has passed, it is ordered by this court the 13th day of May, 1932, be and the same is hereby set and fixed for the execution of the sentence of death heretofore passed upon them by the circuit court of Jackson county, Ala.

Affirmed as to appellants Ozie Powell, Willie Roberson, Andy Wright, and Olen Montgomery, and reversed and remanded as to the appellant Eugene Williams.

GARDNER, THOMAS, BOULDIN, BROWN, and FOSTER, JJ., concur.

ANDERSON, C. J. (dissenting).

While the Constitution guarantees to the accused a speedy trial, it is of greater importance that it should be by a fair and impartial jury, ex vi termini, a jury free from bias or prejudice, and, above all, from coercion and intimidation.

Whether or not these defendants should have been granted a change of venue may be questionable, for, as was stated by the sheriff, when a witness, they could probably get as fair a trial in Jackson as any nearby county, and there is no reason why this was not true. None of the defendants or the injured girls resided in Jackson county, and the prejudice aroused, if any existed, was due largely to the nature of the crime and which was of such a revolting character as to arouse any Caucasian county or community, but the indictment was found and the trial had within a few days after the alleged commission of the offense and when the entire atmosphere was at fever heat.

Every step that was taken from the arrest and arraignment to the sentence was accompanied by the military. Soldiers removed the defendants to Gadsden for safe-keeping, soldiers escorted them back to Scottsboro for arraignment, soldiers escorted them back to Gadsden for safe-keeping while awaiting trial, soldiers returned them to Scottsboro for trial a few days thereafter, and soldiers guarded the courthouse and grounds during every step in the trial, and, after trial and sentence, again removed them to Gadsden. Whether this was essential to protect the prisoners from violence, or because the officials were over apprehensive as to the condition of the public mind, matters little, as this fact alone was enough to have a coercive influence on the jury.

Under the statute, the defendants being unable to employ counsel, it was the duty of the trial judge to appoint counsel, not exceeding two. Section 5567 of the Code of 1923. The court did not name or designate particular counsel, but appointed the entire Scottsboro bar, thus extending and enlarging the responsibility, and, in a sense, enabling each one to rely upon others. Not only this, and notwithstanding the appointment of the entire bar, we find one of the leading, if not the leading, firm subsequently appearing throughout for the state and actively participating in the trial of the cases. This is not intended as a criticism of said firm as the senior member stated to the trial court that when the Chattanooga lawyer, Roddy, appeared upon the scene in behalf of the defendants, he then accepted employment to prosecute, and the trial court accepted the explanation. This Chattanooga lawyer, however, declined to appear as employed counsel and only did so as an amicus curiæ. Again, these defendants were confined in jail in another county during most of the time from the arrest to the trial, and local counsel had little opportunity to confer with them and prepare their defense. They were nonresidents and had little time or opportunity

to get in touch with their families and friends who were scattered throughout two other states, and time has demonstrated that they could or would have been represented by able counsel had a better opportunity been given by a reasonable delay in the trial of the cases judging from the number and activity of counsel that appeared immediately or shortly after their conviction.

Another pertinent suggestion, and which is not intended as a harsh criticism of the local counsel that did attempt to represent the defendants throughout the trial, as we can appreciate the position of a lawyer appointed to defend an indigent defendant whom he may feel is guilty and as against whom public sentiment is at fever heat, the record indicates that the appearance was rather pro forma than zealous and active and which is indicated by a declination on the part of counsel to argue the case, notwithstanding the solicitor insisted upon the right to open and close, and the state did, in fact, have the benefit of two arguments and the defendants none. We, of course, realize that a defendant can sometimes gain an advantage by agreeing to submit a case without argument, as the state has the opening and closing, but, where there is no agreement and the solicitor or prosecutor makes two arguments and the counsel for defendant makes none, it is bound to make an unfavorable impression on the jury.

It also appears that, when the jury returned the verdict in the first case tried, the courthouse was not only crowded, but there was great applause and demonstration of approval, and this was bound to have some influence over those to try the succeeding cases.

There is still another point that would indicate that the juries that tried these cases were coerced by public feeling or sentiment or actuated through passion or prejudice. The punishment for the offense for which these defendants were tried, and which is to be fixed by the jury, runs from ten years in the penitentiary to death, and the jury, as to each of the eight defendants, went the extreme, notwithstanding there may have been some facts, such as difference in age, leadership, etc., that would render the conduct of some less culpable than others, yet we find no discrimination whatsoever in the fixation of the punishment.

As to whether or not these defendants are guilty is not a question of first importance, the real one being, Did they get a fair and impartial trial as contemplated by the bill of rights? The accused being entitled to a trial by an impartial jury is deprived of this right when the jury is overawed or coerced by outside influence, pressure, or conduct.

According to the state's theory, the crime was brutal and harrowing and calculated to arouse the indignation of every one and even stir the blood of the cooler and law-abiding citizen.

" 'But the law should prevail, without any reference to the magnitude or brutality of the offense charged. No matter how revolting the accusation, how clear the proof, or how degraded, or even brutal, the offender, the Constitution, the law, the very genius of Anglo-American liberty, demand a fair and impartial trial. If guilty, let him suffer such penalty as an impartial jury, unawed by outside pressure, may under the law inflict upon him. He is a human being and is entitled to this. Let not an outraged public, or one which deems itself outraged, stain its own hands—stamp on its soul the sin of a great crime—on the false plea that it is but the avenger of the innocent.' " Seay v. State, 207 Ala. 453, 93 So. 403, 405.

It may be that neither of the foregoing reasons, if standing alone should reverse these cases, but, when considered in connection with each other, they must collectively impress the judicial mind with the conclusion that these defendants did not get that fair and impartial trial that is required and contemplated by our Constitution. Therefore, in justice to the defendants and to the fair name of the state of Alabama, as well as the county of Jackson, these cases should be retried after some months of cooling time have elapsed and by their vigilant employed counsel.

I think that the trial court erred in refusing to grant a new trial in each of these cases and therefore feel constrained to dissent from the affirmance of same.