## CARINGELLA v. UNITED STATES.
### No. 5448.

Circuit Court of Appeals, Seventh Circuit.
July 10, 1935.

John B. Boddie, of Chicago, Ill., for appellant.

Dwight H. Green, U. S. Atty., and Earle C. Hurley, Asst. U. S. Atty., both of Chicago, Ill., for the United States.

Before EVANS, SPARKS, and FITZ-HENRY, Circuit Judges.

EVANS, Circuit Judge.

Four defendants, including appellant, were tried by a jury, and a general verdict of guilty was returned against all of them. One defendant pleaded guilty and one was not apprehended. Appellant was sentenced to serve three years in the penitentiary.

Coming directly to the first assignment of error, we may state the narrow fact issue thus, Did appellant knowingly receive the stolen cases of eggs? Other facts are necessary to establish guilt, but their existence is shown by other evidence.

As bearing on this issue, the facts are: On June 18, 1934, a truck loaded with three hundred twenty cases of eggs left Herman, Nebraska, for South Water Street, Chicago, with two men in charge who "changed off" at the wheel. It reached Geneva, Illinois, about five o'clock in the morning June 20th. Shortly thereafter, on the last leg of its journey, five bandits took possession of the truck and

its cargo and left the drivers by the roadside. One of the two men on the truck described the robbery to the jury as follows:

The truck which he was driving was pushed to the side of the road by a small auto in which were five men. After being made to surrender the truck at the point of revolvers, the drivers were placed on the floor of an automobile and driven around for a half hour and then released. They found themselves out in the country. As soon as possible they notified the police in the suburb of Willow Springs and were by them brought to the Maxwell Street Station, Chicago. News of the "hijacking" was immediately radioed to the police squad cars. An hour after their arrival at the station, the truck and some of the eggs were brought in and the two hundred thirty-three cases of eggs found in a garage were turned over to the commission house for which they were intended.

The details of the apprehension of the fugitives were given by the three policemen who captured them. They were cruising in the squad car in the vicinity of appellant's place at seven thirty o'clock in the morning when they noticed a truck being unloaded in the alley at the garage in the rear of appellant's premises. They became suspicious, and, when they approached the truck to investigate, the two men on the truck and the three men on the ground took flight. They pursued them, firing a shot at Carmen Cozzi, one of the defendants, who was taking refuge in a basement next door, and apprehended them. They also caught another named Pasquale Sansonetti. The other defendants identified by the officers were Joe Mendino, Leonard Gianola, and Dominick Monaco.

As the door at the rear of the store was locked, the officers went to the front of the premises and entered appellant's butcher shop. All testified (as did appellant himself) that he was raking the sawdust on the floor of the shop. Appellant testified that he had been summoned to open the store, shortly before, by two customers (who fully corroborated him) who wanted to purchase meat and that he came downstairs and after waiting on them started to sweep the sawdust, as was his custom. He also said his brother had taken the truck from the garage about seven o'clock that morning to go to the stockyards, as was his habit, to purchase meat.

Appellant said he knew some of the defendants as residents of the neighborhood. He said that no one had access to the garage except his brother and himself and that he had given no one permission to store eggs there. In the conduct of his butcher business he sold about a case of eggs a week.

Because of its important bearing on the issue of appellant's knowledge, we quote *verbatim all* of the testimony bearing thereon:

"(Officer Mau) I asked him who owned the garage in the rear. He said that he did. I asked him, did he own the merchandise that was in the garage, and he said he knew nothing of any merchandise in the garage. I brought him back and showed him the eggs, and he said he didn't know how they got there or where they came from. * * * I also had a conversation with Mr. Carengello in the presence of Mr. M., the government man, immediately after his arrest, at the Maxwell street police station, the 20th of June, 1934. Mr. M. asked him if he was the owner of the property at 924 Taylor, and about the eggs in the garage and he told us * * * that he knew nothing about the eggs."

"(Officer Kaupert) We asked him about the eggs but all he did was shrug his shoulders and wouldn't answer."

"(Officer O'Keefe) On the morning of June 20th, I saw Carengello raking sawdust on the floor of the butcher shop. We asked him what he knew about them eggs in that garage back there and he just said he didn't know nothing about it. * * * He said he knew nothing about the eggs but said the garage was his own."

Appellant testified:

"No, I did not conspire with any other defendants in this case to steal eggs, or bring any eggs to my place. The first time I saw the eggs was when the copper took me in back. No one delivered those eggs to me. * * * No one ever brought a large cargo of eggs or butter to my garage. I gave no one permission to bring those eggs or butter, and it never happened before. I am not friendly with Mendino and Gianola, nor with Cozzi, nor Sansonetti either. They all live in the neighborhood. I know of no reason why they would bring those eggs over and put them in our garage."

Appellant had been the proprietor of a butcher shop for several years. The shop

occupied the ground floor of a three story building. Appellant lived on the third floor with his wife and six children. He, his brother, and their wives owned the premises. In the rear of the premises there was a garage. To facilitate an understanding of the premises and to eliminate involved description, a sketch is here presented, taken from an exhibit.

As a fact from which an inference of appellant's knowledge of the storing of the stolen eggs in his garage might be drawn, evidence was received as to the visibility to one standing in the store of occurrences in the garage. One officer testified there was a plain view from the *rear* of the store to the garage (photographs in evidence show that a back stairway might have obstructed this view). He also stated that the icebox in the store "would prevent Caringella's view from the front of the store to the back."

Appellant testified:

"I was standing in the middle * * * when the officers came in. You can not see from there into the back and the garage."

Four persons of apparently good reputation and standing in the community testified as to appellant's integrity and reputation as a law abiding citizen.

The recital of the story of the two young men who, relieving each other at the wheel, drove their truck from Herman, Nebraska, to Chicago, only to have the same taken from them at the point of revolvers by some young Chicago hoodlums and soon-to-be, gangsters, whose guilt is established by the admission of one and proof against others which leaves no reasonable doubt, arouses resentment to the boiling over point. The young criminals who commit these crimes contribute nothing to society, but flaunt the laws of the land, live by their crimes, and defy the government to stop their criminal practices. When arrested and arraigned they promptly hide behind the Fifth Amendment of the Constitution and refuse to give testimony which would lead to the apprehension of the master criminal in this class of cases—the criminal who buys the stolen merchandise, without whom the illegal business would be profitless and therefore cease. As the offense defined by the Federal statute necessitates the proof of the interstate commerce character of the transportation and the *knowledge* that the goods were stolen, the importance of the so-called protection of the innocent which is provided by the Fifth Amendment of the Federal Constitution becomes apparent. Instead of a protection of the innocent, the Fifth Amendment of the Federal Constitution is a shield behind which the guilty hide, and as a result the infant industry of "hijacking" trucks, loaded with farm products destined for city

consumption, thrives. It makes apprehension and conviction difficult and sometimes impossible and brings reproach upon those who are responsible for the continuance of 'the existence of laws which shield the guilty under the pretense of protecting the innocent.

But conviction must rest on sterner realities than criticisms of existing practices in criminal proceedings. Suspicions are not sufficient to support a conviction. Unexplained possession of stolen goods shortly after a theft may evidence guilt. In fact, the surrounding circumstances, coupled with this fact of possession, may make a persuasive case of guilt.[1] The acts and conduct of the defendant when confronted by accusers and the accusing evidence may be determinative of the issue. And this issue should ordinarily be left to the jury.[2]

But, in the instant case, there is lacking (a) the possession of the stolen goods, and (b) evidence surrounding the discovery which is inconsistent with innocence.

(a) Proof that a thief drove his truck onto B's premises does not establish possession in B. When in addition to driving the stolen truck onto B's premises, there is proof that the thief is unloading the stolen cargo, it raises no presumption against B, if B be ignorant of the thief's trespass. It would hardly be logical to assume that, if B, arising early in the morning, went into the summer kitchen to start his breakfast and found there a tramp getting his breakfast, a partnership between B and said tramp existed.

(b) The explanation. The surrounding circumstances were consistent with innocence. The story of the brother going to the stockyards to make purchases, leaving the otherwise locked garage open, is not only reasonable, but established conclusively. Appellant's explanation that he was in the shop to sell meat is corroborated by two customers by whom he was called from the sleeping quarters. That he then proceeded to rake the sawdust on the floor is the testimony of four witnesses, including two Government witnesses. When confronted by evidence showing that the eggs were in the garage he protested inability to understand how the eggs came to be there. That he shrugged his shoulders and shook his head is not indicative of guilt. There are some people who talk more with their hands and shoulders than others. Yet, there is no such universality of expression through shoulder shrugs or hand talk as would justify a court in assuming that either was indicative of guilt.

Reduced to its last analysis the circumstance which arouses suspicion is this, Why did the thieves select appellant's garage and unload the eggs therein if no arrangement or understanding with the owners existed? This action by the thieves may be hard to explain and yet not indicate appellant's guilt. Why does a tramp sleep in one barn and not another? Why go to one back door and not the next? Here, there existed some explanation of the thieves' action. The young men from Nebraska diligently pursued them. Although dumped out of the car in the country, they were near a suburb of Chicago and within an hour of the hijacking the radio was informing the police of Chicago of the theft. The thieves therefore may have known that the police were on their trail. The police radio announcements made possession of a truck load of stolen eggs quite undesirable. The thieves either had to abandon the truck with its load or unload. They were in this predicament when they drove up to appellant's garage, which had been left open by his brother when he departed for the stockyards. If we were to indulge in suspicions, we would say they point more strongly toward the brother who left before appellant arose or the thieves arrived at his garage.

Moreover, appellant's business was not in eggs. He used but a crate a week.

Further discussion seems unnecessary. The burden was on the Government to establish appellant's guilty participation in the crime. This burden might have been overcome by facts from which inferences pointing to guilt arose. But proof, by facts or inferences, was necessary. In

[1] Wilkerson v. U. S. (C. C. A.) 41 F. (2d) 654. See cases collected in note 68 A. L. R. 187; Sellers v. U. S. (C. C. A.) 299 F. 258; Rosen v. U. S. (C. C. A.) 271 F. 651; Levi v. U. S. (C. C. A.) 71 F.(2d) 353; Niederluecke v. U. S. (C. C. A.) 47 F.(2d) 888.

[2] Cohen v. U. S. (C. C. A.) 277 F. 771; Cuomo v. U. S. (C. C. A.) 231 F. 116; Ingram v. U. S. (C. C. A.) 5 F.(2d) 940; Overby v. U. S. (C. C. A.) 23 F.(2d) 908.

the instant case the Government rested its case upon the asserted inferences arising from the fact that thieves were caught unloading the stolen eggs in appellant's garage. The inference is illogical because the fact—possession—from which the presumption arose, was disproved.

As a reversal of a judgment by this court leaves the Government free to retry the case or to dismiss it if no additional evidence of appellant's participation in the crimes be obtainable [Collenger v. U. S. (C. C. A.) 50 F.(2d) 345], it is necessary for us to consider another assignment of error which appellant raises.

█ The indictment contained four counts. Appellant was named in three of them, but not in the fourth. Some five or six other defendants were named in all counts. Appellant charges misjoinder of counts.

The four counts joined in the single indictment include (a) stealing merchandise from a truck which was being transported in interstate commerce, (b) receiving the merchandise knowing the same to have been stolen, (c) possessing the merchandise knowing the same to have been stolen, and (d) conspiring to commit the other offenses.

The Government relies upon 18 USCA § 557. It cites Castellini v. U. S. (C. C. A.) 64 F.(2d) 636.

Appellant relies upon McElroy v. U. S., 164 U. S. 76, 17 S. Ct. 31, 41 L. Ed. 355.

We are satisfied that notwithstanding some language in McElroy v. U. S., supra, the charges were properly joinable. Where offenses such as stealing from interstate shipments, concealing or possessing goods stolen from interstate shipments are separately charged in a single indictment, it is not necessary that all of the defendants be guilty of all of the offenses. Appellant could not be prejudiced because of the proof which tended to establish the theft, with the commission of which he was not charged, because it was necessary to prove that the goods were stolen in order to establish the charge preferred against him, to-wit, receiving *stolen* goods.

The judgment is reversed, and the cause remanded for further proceedings.