## UNITED STATES v. LISS et al.
### No. 223.

Circuit Court of Appeals, Second Circuit.
May 28, 1943.

On Rehearing Aug. 2, 1943.

Writ of Certiorari Denied Oct. 18, 1943.

See 64 L.Ed. 78, 88 L.Ed. ——.

See also, D.C., 43 F.Supp. 203.

Jacob B. Goldberg, of New York City, for Liss, Conte, and Lowenstein.

M. M. Kreindler, of New York City, for Rudy.

Benjamin Adler, of New York City, for Londoner.

Newman Levy, of New York City, for Palmer and Leading Drug Co.

Saul M. Meadow, of New York City, for Cohen, and Huel's Chemists, Inc.

William Lindenbaum, of New York City, for Mainella.

Solomon Millendorf, of New York City, for Geffner.

Albert Lyons, of Brooklyn, N. Y., for Al N. Fox and Max Fox.

Jack J. Elkin, of New York City, for Jaffe.

Robert Roy Dann, of New York City, for the United States.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The defendants appeal from judgments of conviction under an indictment charging them with a conspiracy to violate the laws regulating the sale and dispensing of narcotic drugs. Liss and Conte were the prime actors throughout all the events laid in the indictment. In the first two of three phases they confederated with Rudy; later the venture took on an entirely different character, and Rudy dropped out. The other defendants had various parts in the scheme, and, as will appear, some of them were not shown to have been connected with it at all. Londoner and Palmer, who went by the name of the Leading Drug Company, were manufacturing chemists. Al N. Fox and Max Fox were jobbers, trading as the Recro Drug Corporation. The other defendants were drug and chemical retailers within the larger City of New York. All the defendants complain of various errors committed during the course of the trial, but the chief objection common to all is that the conspiracy embraced several different crimes which should not have been tried as one. These supposed errors, coupled with the failure to connect a number of the individual accused, are the points to be considered. The evidence introduced permitted a jury to find the following facts.

Late in 1939 and early in 1940, Liss, Conte and Rudy concocted a plan to produce synthetic morphine. They equipped a laboratory in North Bergen, New Jersey, and procured the assistance of a chemist named Jackson; but their efforts were fruitless; and this first phase may be dis-

regarded, because, as the judge charged, there was nothing criminal in the enterprise anyway, for the statute did not regulate dealing in anything but derivatives of opium and coca leaves. After discovering that synthetic opium could not be made, the three consulted further with Jackson as to the possibility of extracting opium from such substances as paregoric, "Stroke's Mixture"—a cough medicine—and lead and opium wash: all being "preparations of limited narcotic content," which may lawfully be sold at large, though under certain statutory regulations. These experiments also failed and were abandoned. Rudy dropped out altogether at that stage; he did not appear in any of the subsequent dealings of Liss and Conte with the others, and none of these ever had anything to do with the "paregoric conspiracy," as it may be called. That ended not later than April, 1940, and at about the same time Liss began buying lead and opium wash. It does not definitely appear just what his purpose was: the theory of the prosecution appears to have been that he and Conte meant indirectly to buy the wash in quantity from Londoner's company and to return it circuitously to Londoner, who should sell it again. The wash would thus create a kind of revolving fund, the same parcels appearing as a series of sales of different parcels on Londoner's books, which should justify large purchases of free opium by him as an ingredient. This free opium Londoner would then dispose of to Liss and Conte illicitly; and they would sell to addicts. If such was the plan, it was never proved; and the prosecution does not now seek to maintain the conviction on that theory. What it does assert is that it proved a conspiracy to violate the regulations governing the sale of "preparations of limited narcotic content." § 2551(a), Title 26 U.S.C.A. Int.Rev.Code. That section relieves such preparations from the ordinary regulations for the sale of preparations of opium, but only upon several conditions: first, they shall be dispensed only "as medicines"; second, a record shall be kept of all sales for two years; third, every person dispensing the "preparations" shall register as required in § 3221, and shall pay a special tax of $1.00 a year. Finally, Article 183 of Regulations 5, provides that although orders for such preparations need not be on any particular form, if they are "from a dealer" (that is, not a consumer), they must bear the regis-

try number of the dealer who gives the order. (All dealers must have such numbers.)

Whatever his purpose, Liss began in April, 1940, and continued for about six months, to buy inordinately large quantities of lead and opium wash. Among those to whom he went in April, was Londoner, whom he asked to sell him for his own resale to the owners of race horses, who used it, he said, to medicate the horses' legs. Londoner told him that he could not sell for such purposes because Liss had no registry number, as he would not be selling to him as a consumer; but he suggested that Liss should buy of retailers and jobbers to whom he (Londoner) would sell; and Liss's extremely large purchases were made in that way. Among the retailers to whom Londoner sold were: Cohen and Geffner, who used the name of Huel's Chemists, Inc.; Lowenstein and Jaffe, who used the name, Broed Pharmacy; Mainella, who traded under his own name; and two others who turned state's evidence: Frankel and Garfinkle. Liss bought of all these retailers, and Conte went about and picked up the goods.

 The first question is as to combining in one indictment and as a single conspiracy two separate conspiracies: the "paregoric" and the "lead wash." These were separate not only in personnel but in content. The only confederates in the "paregoric conspiracy" were Liss, Conte and Rudy; in the "lead wash conspiracy," Liss, Conte and the druggists. The content of the two was altogether different. The "paregoric conspiracy" was to extract opium from "preparations of limited narcotic content"; the "lead wash conspiracy" was to allow Liss and Conte to procure "lead wash" for use not "as medicine," and for resale contrary to the regulations. Even had the prosecution succeeded in establishing the theory of a "revolving fund," the content of the second conspiracy would have been as different as possible from the first. There was therefore a variance between allegation and proof, and while that is not fatal of itself (Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314), it is not necessarily harmless. The question is like that of joining separate crimes in separate counts of a single indictment, or of consolidating separate indictments for trial; the propriety of either depends upon the danger they create that the jury may confuse the issues. United States v. Lotsch, 2 Cir., 102 F.2d 35; United States v. Smith, 2 Cir., 112 F.2d 83, 85; United States v. Perlstein, 3 Cir., 120 F.2d 276, 281; Firotto v. United States, 8 Cir., 124 F.2d 532, 535.

 In such situations it is always possible that a jury may use evidence which connects an accused with another crime, not only as proof of the crime charged against him, but—when there are several accused—as proof of the crime charged against the others. The first danger is greater than the second; and the fusing of the two conspiracies into one was therefore more serious against Liss and Conte—the only two of the accused who were confederates common to both conspiracies—than to Rudy or to the druggists. There was therefore a not wholly imaginary danger that the jury might use the evidence against them cumulatively to prove both charges. If however the conspiracies had been separated into two counts or two indictments it does not seem to us that it would have been improper to try Liss and Conte upon both charges at the same time. The joinder section (§ 557, Title 18 U.S.C.A.), allows the joining of "acts or transactions of the same class of crimes," and that presupposes that the transactions may be quite independent of each other. True, the transactions must always be such as may be "properly joined," but that only means that the likelihood that the evidence will be misapplied is not serious practically. The mere fact that the accused are different in two counts is no longer important, despite what was said in McElroy v. United States, 164 U.S. 76, 80, 17 S.Ct. 31, 41 L.Ed. 355; United States v. Smith, supra, 112 F.2d 83, 85; Firotto v. United States, supra, 124 F.2d 532, 535; Morris v. United States, 5 Cir., 128 F.2d 912, 917. Here it would have been competent upon a trial of Liss and Conte upon the "lead wash conspiracy" alone to prove that they had previously tried to extract opium out of paregoric. Their guilt in the "lead wash conspiracy" depended in part upon whether their enormous purchases of "lead wash" were "as medicine," and it was competent on the issue of their intent to show that they had had a criminal intent on earlier occasions. Hence they have no just complaint of the variance.

 As to Rudy the only question that can arise is whether he could have been prejudiced by showing that Liss and Conte, accused as his confederates in the first

conspiracy, had gone on to commit a kindred crime with the druggists. If he was prejudiced it could only be because the jury reasoned that the corroboration of the guilty disposition of Liss and Conte made it more probable that there had been a "paregoric conspiracy" and that Rudy was a confederate in it. They may of course have so reasoned, but to assume so is really to deny them the most rudimentary power of discrimination, and, consistently, would make difficult any trial in which the number of accused was large. The chance seems to us too remote unless all joinders are to be forbidden. Obviously there was no possible danger to the druggists in the evidence connecting Rudy with the "paregoric conspiracy"; but the same question as arises in Rudy's case does arise as to them from the evidence of Liss's and Conte's involvement in that conspiracy. Because these two had been engaged in an earlier illicit enterprise, the jury may have assumed that the druggists must have known that they were in an illicit enterprise when they bought the "lead wash." In short, they may have imputed to the druggists the mens rea of Liss and Conte. That question seems to us no different from the one we have just discussed; if we are to clutch at such shadows, the criminal prosecution of complicated crime becomes impossible, and the phantom of the innocent man convicted will prevent any effective enforcement of the law. For these reasons we think that the variance was immaterial.

■ The next objection common to a number of the accused is the judge's bias against them. It may perhaps have been true that at times his manner was not as urbane as could have been wished, and counsel may have occasionally smarted under his admonitions; but we can find no evidence that he improperly cut short their examination, and certainly none whatever that he expressed even indirectly any opinion as to the guilt of the accused. In a trial which lasts for eight court days, and in which there are so many accused, a judge's serenity is often unduly tried by the persistence of counsel; no doubt perfection should be the standard, but if we were to insist upon it, few convictions could survive. More plausible is the complaint that the colloquial charge did not adequately inform the jury of the issues they had to decide. This was not so important as to the "paregoric conspiracy," because the evidence as to that was simple, and the

issue itself unmistakable; but the same was not true of the "lead wash conspiracy." There being not enough evidence to support a verdict on the theory that the "lead wash" was being circulated back to Londoner, the only conspiracy of which the jury could find the druggists guilty was that they were all in a venture to supply Liss and Conte with the wash, knowing that they meant to resell it, or that it was not to be used "as medicine," or that no record should be kept of the sales, or all of these things. The charge did not tell the jury that these were the issues for them to decide; the judge merely read them the relevant sections from the statute and the regulations; and the wilderness of the resulting verbiage must have left them pretty much in the dark. It did help a little that at the end he said that the question was whether the accused were "buying and selling this lead and opium wash in a legitimate way through legitimate channels in the ordinary course of business"; but even that was scarcely an adequate description of the prescribed formalities which they were charged with having conspired to evade.

■ None of the accused excepted to the charge, but some did request instructions, which the judge refused because they were not handed to him before all the counsel had summed up. This refusal was not however important except in the case of one request, for all the others added nothing of importance to the colloquial charge and might properly have been refused. The exception was Rudy's request that the jury be told that he had had no connection with the "lead wash conspiracy." That would certainly have been a desirable makeweight against possible confusion from the joinder of the two conspiracies; and we shall count the refusal as an error. No question arises more often in criminal appeals than whether an error should result in reversal; formerly—acknowledging that it is theoretically impossible to fathom the jurors' minds—it was the practice to give the accused the benefit of every intendment; and indeed the modern disposition to assume that an error has been harmless cannot rest upon any unsparing logical analysis. Perhaps all that a court should ever say is that a remote chance of prejudice should not balance the extreme probability that the jury came to the right result. A majority of us think that that was the case here. Rudy's name did not occur anywhere in the

testimony about the "lead wash conspiracy"; his share with the "paregoric conspiracy" had been altogether in New Jersey, although he had been in New York once while he and Liss and Conte were trying to make synthetic morphine. If he suffered any prejudice it was in the joinder, not in the refusal of this request; and, as we have said, the joinder was far more likely to have prejudiced Liss and Conte than him.

There remains therefore only the question as to the adequacy of the evidence. Nothing need be said of the guilt of Liss, Conte and Rudy as to the "paregoric conspiracy": Jackson's testimony was direct, and the jury might believe it or not as they chose. The same is true of Liss's and Conte's connection with the "lead wash conspiracy." In the first place the jury might well have disbelieved the explanation that they wished to use it as a medicament for horses' legs; indeed, taken in connection with their earlier activities this was patently a fabrication. Again as to Londoner, although he knew nothing of the "paregoric conspiracy," he sold over six times as much of the wash in 1940 as he had in 1939, and all of it went to Liss. It was Londoner also who induced the Foxes to make sham sales to retailers, who were to take back the goods, some of which eventually reached the hands of Cohen and Mainella, both purveyors to Liss. Finally, Londoner's very reason for refusing to sell to Liss proved that his later indirect sales to him through retailers were illicit; for he knew that Liss had no right to buy at all, if he was to resell to racing owners. Liss, Conte and Londoner were the chief actors in this enterprise; there is not the least doubt of their guilt. The evidence as to the others we will now consider separately.

Palmer was the owner of more shares of the Leading Drug Company than Londoner, but the evidence goes no further than to show that he helped move some cases of the "wash"; and ordered all the opium. There was really nothing against him but the amount of the opium ordered; and it does not appear that he knew that it was all to be made into "wash" and go to Liss. It is extremely likely that he was in fact privy to the conspiracy, but the proof seems to us lacking. He and Londoner kept proper records of the sale of "preparations of limited narcotic content."

Cohen sold very large quantities of wash to Liss and, after what the jury might have thought an initial evasion, said that Liss had told him that he was reselling the wash on race-tracks; if so, that in itself was a crime for he then knew that Liss was not a consumer. He kept no records of sales of "preparations of limited narcotic content." Geffner got all the profits of the sales and kept whatever records there were, if any. He was aware that some of the "wash" had been delivered at the store and took part of it to the cellar; and he deceived the narcotic agent who inquired how much "wash" the corporation had dealt in; and Cohen swore that they discussed whether the sales were lawful. Nevertheless Geffner apparently had no direct dealings with Liss, and my brothers think that the evidence is not direct enough to hold him.

Mainella sold large quantities—650 gallons—to Liss who told him the race track story; he kept no record of his sales and was by his own statement "worried" over the quantities ordered. A Providence druggist who had sold to Liss, delivered two separate consignments of 100 gallons each at his store, and it is most unlikely that the second parcel at least could have been put there without Mainella's consent. He told a narcotic agent that these had only been "dropped off in the alley in the rear of my store"; but certainly a jury might have found that he would have taken some action to prevent any second parcel, if the first had been delivered without his consent. After he finally became too frightened, he recommended Liss to Lowenstein; then at least he must have been aware that the dealings were illicit.

As we have just said, Lowenstein was Mainella's successor with Liss, with whom he dealt directly, though his sales were only in the neighborhood of 100 gallons and there is no evidence that he knew of the story about the race horses. He was however at one time troubled about the legality of the sales, for he says that he consulted a jobber with whom he dealt; and he well might have been troubled, considering the curious way in which the business came to him. Why Mainella should have turned it over to him nowhere appears; there seems to us a fair inference that he must have at least suspected, in view of the highly regulated character of the industry, that there was something un-

lawful about it. We are disposed to think that this was enough to support a verdict. There would certainly have been enough if a talk between him and Liss could be dated in which Liss showed consciousness of guilt, but it does not appear that this took place until after his connection had ended. The evidence against his partner Jaffe was too weak to sustain a conviction.

It is clear that the two Foxes were engaged with Londoner in illicit trading. By the arrangement of which we have already spoken Londoner sold wash to them which they in turn sold to retailers who got a bonus, often very large, and who then returned the purchases to the Foxes. Clearly these sales were not "as medicine," and some of the returned wash they sold to Cohen and to Mainella, though it does not appear whether any of it ever reached Liss. Nor is there any evidence that the Foxes ever had any dealings with Liss or that they knew him in the transaction. Nevertheless, it was certainly permissible for a jury to conclude from their bizarre transactions, all set on foot by Londoner, that they knew that the sales were part of some kind of illicit traffic. The wash was an opiate derivative, the sales of which were regulated; the regulations were being violated by a transparent disguise and at the instigation of the producer. The venture was not to have its conclusion upon return of the goods which in fact went to two of those who we know were purveyors to Liss. It was not necessary that they should have dealt with Liss, or even have known him in the transactions; all that was necessary was that they should be engaged in a scheme which involved the disposition of the wash in violation of the statute and regulation, and that that scheme was the one charged in the indictment. The evidence justified that conclusion.

The case of United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, on which the druggists rely was quite different. The question there was whether the accused were parties to a conspiracy to make illicit alcohol; and it was held that it was not enough to show that they knew that the purchasers of the sugar which they sold would use it for that purpose. Here the conspiracy was to evade the statute and regulation surrounding the sale of "preparations of limited narcotic content"; and these were in substance three: (1) That the "preparations" must be sold "as medicine"; (2) that they must be sold either

to a consumer, or a registered dealer; (3) that the sales should be properly recorded. So far as the accused conspired to evade any one or all of these regulations, they conspired to commit a crime. It is true that the first of these crimes demanded knowledge by the druggists of Liss's purpose not to use the wash "as medicine," but it demanded no more than a sale with such knowledge; it did not demand that the druggists should be parties to any further crime: e.g., to Liss's unlawful use of the wash after he got it. Again, there may be doubt whether the evidence proved that the conspiracy contemplated that the sales should not be recorded; but that was not necessary for there was ample evidence that it contemplated the other two crimes.

Convictions of Palmer, Geffner and Jaffe reversed.

Convictions of the other appellants affirmed.

FRANK, Circuit Judge (dissenting in part).

For the following reasons, I dissent as to the conviction of the defendants other than Liss and Conte.

There are some persons (and I am one of them) who have come to doubt the virtues of jury trials in civil actions. However, even of those who entertain such doubts, most agree that in criminal actions the right to a jury trial should be preserved —that is, the accused should be tried by jury if he so elects (although it is perhaps less certain than is generally supposed that defendants fare better with the average jury than with the average trial judge sitting without a jury). But whatever may be the views of judges about the jury system, it is their duty to maintain the function of the jury in all jury trials, until the jury is abolished by legislation and constitutional amendment. And that means that, in a criminal action tried before a jury, a defendant should not be convicted unless the jury finds him guilty—after a fair trial. Perhaps I am old-fashioned in saying that I believe that the doctrine of "harmless error" does not dispense with the necessity of a fair trial of a defendant whom the appellate judges believe to be guilty. A jury trial does not seem to me to be fair when it plainly appears that the jury has not been well informed as to the facts. As I understand the fundamental principle of the jury system, we appellate judges do

1002

not sit as a jury. It surely follows that we ought not to sustain a verdict of guilty after an unfair trial merely because, upon reading the printed record, we believe that, had we been the jury, we would have convicted. Any other rule has the result that the presence of the jury will often become a mere formality; for then, if only the jury finds guilt, no matter by what unfair tactics it was persuaded to do so, we judges, in actual fact, decide the case.

I cannot subscribe to a rule that what is substantial reversible error depends not on whether it probably affected the jury to the substantial prejudice of the defendant but on whether we appellate judges think the defendant guilty or innocent. If that is to be the rule, I would urge that criminal jury trials be abolished as expensive and time-consuming shams. I have known lawyers who assert that only by such a rule can the jury system be made "workable." But such a rule renders the jury system workable by not working it; if we happen to think that the jury system is impractical and unworkable, let us frankly say so; then our citizens, informed of the realities, can decide whether to dispense with it.

At a minimum, if we are to adopt the rule described above, we should make that fact unmistakably clear, so that the public will thoroughly understand what a jury trial now really is—and is not. The "principle of publicity," which governs in the American judicial process,[1] calls not only for trials held in public but also for the publication of judicial opinions that disclose the grounds of decisions; that publicity is illusory if the true grounds are not stated.[2] To adopt a rule of decision concerning jury trials without publicizing it prevents the public from knowing how its government operates. That is unwise in a democracy where the workings of all branches of government should be plain to the citizens. There can be no true democracy when citizens are treated like infants who must not be told the facts of life; mysteries as to the workings of government impair one of the most important features of democratic participation—the capacity of citizens intelligently to criticize and seek changes in those aspects of government which they consider undesirable—and breed a sense of frustration and a cynicism which may pave the way to the destruction of democracy.[3] If we are to apply a rule by which we, who do not see or hear the witnesses, are, in many cases, to decide the facts, we should so announce. We ought not to become fact-finders while appearing not to be. Moreover, if we are to find the facts, we ought at least to impose on ourselves the obligation we now impose on trial judges when they sit without a jury—that of publishing the findings.[4]

In the case at bar there was the greatest likelihood that the jury was confused. The indictment, as my colleagues concede, was misleading in that it charged twenty defendants with engaging in one conspiracy when, as the evidence disclosed, there were in fact three distinct alleged conspiracies. One of these conspiracies was not unlawful. Conte and Liss were parties to the other two conspiracies. But, as my colleagues say, there was no evidence whatever that Rudy was a party to the third, and no evidence that the other defendants, except Liss, Conte and Rudy, were in any way involved in the second. It is difficult for me to believe that the jury, at the end of this long trial, was able to keep in mind the distinction between the second and third conspiracies and to comprehend, with any degree of clarity, that evidence relevant to the second should not be considered in determining whether there was guilty participation in the third, or vice versa.

The jury may well, then, have erroneously combined the evidence and found guilt when it would not have done so had it

---

[1] See Millar, in Engelman, History of Continental Civil Procedure (1927) 77f.

[2] There Holmes is our guide; he taught that it is wholesome for courts to spell out their mental processes and frankly to acknowledge just what they are doing. As we recently said, "In all provinces of thought, it usually promotes intelligence to bring out into the light concealed actual postulates of thinking." Beidler & Bookmeyer, Inc. v. Universal Ins. Co., 2 Cir., Mar. 5, 1943, 134 F.2d 828, 831.

As to Holmes, see, e.g., Holmes, Book Notices (ed. by Shriver, 1936) 10-11; Holmes, Collected Legal Papers (1921) 181, 184; Vegelahn v. Guntner, 167 Mass. 92, 104, 105, 106, 44 N.E. 1077, 35 L.R.A. 722, 57 Am.St.Rep. 443.

[3] Cf. Laswell & McDougal, Legal Education and Public Policy, 52 Yale L.J. (1943) 203, 207, 217, 218, 219, 220, 225, 230.

[4] Matton Oil Transfer Corp. v. The Dynamic, 2 Cir., 123 F.2d 999; United States v. Forness, 2 Cir., 125 F.2d 928,-942; Kulukundis Shipping Co. v. Amtorg Trading Co., 2 Cir., 126 F.2d 978, 980.

observed the distinction. In those circumstances, the least that the trial judge should have done was to aid the jury in his charge by differentiating the conspiracies. Not only did he not do so but, as my colleagues point out, his charge was, not too enlightening. Moreover, he expressly refused, when requested by Rudy's counsel, to instruct the jury that there was no testimony showing Rudy's connection with the third conspiracy—and that, too, after a trial which consumed eight days in which testimony was taken that fills more than seven hundred and fifty printed pages.[5]

My colleagues concede that there may have been confusion, but they conclude that this jury, in fact, was not misled. That, I submit, is unverified and unverifiable guessing. It is well-settled that, generally, it is improper for the court to be affected by anything it may learn, even from the jurymen themselves, as to how the jury arrived at its verdict.[6] Unable, as we are, therefore, to interrogate the jurors, any effort on our part to determine that they were or were not confused is an undertaking which most psychologists would regard as hopeless. Who are we judges that, in such circumstances, we should so confidently probe the mental interiors of the jurors? The best that can be said here is that the chances are as good that the jurors were bewildered as that they were not. Where such chances are anywhere near equal, there has been substantial error.[7] We judges ought to take judicial notice of what every ordinary person knows about juries, and therefore to recognize that the twelve citizens, casually summoned to serve as jurors, are not trained fact-finders and can be easily bewildered. Our experience shows that even trial judges, experienced in finding facts, when sitting without a jury, sometimes do not avoid confusion as to the evidence when, as here, there are many defendants and the trial is not brief. The need for safeguarding defendants from misunderstanding by the jury is peculiarly acute in conspiracy trials which lend themselves to unfairness, since, at best, they often permit the jury to hear evidence as to some of the defendants which the jurymen may easily but mistakenly believe has a bearing on the guilt of others.

It is true that a variance between the indictment and the proof is not invariably fatal error. Whether or not it constitutes such error depends upon whether the record in the particular case does or does not show a likelihood of substantial prejudice. My colleagues suggest that the issue is similar to that of the propriety or impropriety of joining separate crimes in a single indictment or of consolidating separate indictments for trial. Yet in all the cases which they cite, and in which such joinders or consolidations have been held proper, the courts have pointed out either that the separate crimes were closely re-

---

[5] The trial judge refused Rudy's request to charge the jury that there was "no testimony in the case that the defendant Rudy had any part in the purchase, sale, distribution, extraction or diversion of lead and opium-wash." The trial judge gave as his reason for this refusal that the request was made too late under the Rules. In this he was mistaken. At one time there had been a Rule in the Southern District of New York that, when requests were not submitted before summing up, the judge, in his discretion, could refuse to consider them. But this Rule was abolished in 1938. The taking of the testimony was concluded on April 20, 1940 at about 4.00 P. M. Counsel for Liss then delivered his summation to the jury which he concluded at about 5.15 P. M. Counsel for Rudy was then instructed by the court to deliver his summation and did so only after the court had denied his application to adjourn until the following morning. The next day, at 2.30 P. M., Rudy's counsel submitted to the court his written request to charge while counsel for other defend-

ants were still in the process of addressing the jury and when the prosecutor had not yet delivered his summation. The court commenced its charge to the jury at 3.40 P. M. At the conclusion of this charge, Rudy's counsel asked the court to charge on his written request. In the circumstances, the refusal to charge as requested was, I think, an abuse of discretion.

[6] McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; 8 Wigmore, Evidence (3d ed. 1940) 668, 677, 282ff; cf. Fayerweather v. Ritch, 195 U.S. 276, 307, 25 S.Ct. 58, 49 L.Ed. 193.

[7] See, e.g., Wilmington Star Mining Co. v. Fulton, 205 U.S. 60, 79, 27 S.Ct. 412, 51 L.Ed. 708; Schilling v. Delaware & N. R. Corp., 2 Cir., 114 F.2d 69, 72; Christian v. B. & M. R. R., 2 Cir., 109 F.2d 103, 105.

I have expressed such views more at length in Keller v. Brooklyn Bus Corporation, 2 Cir., 128 F.2d 510, 513.

lated (in some of them, the proof of the one being necessary for the proof of the other) or that, as in our decision in United States v. Lotsch, 2 Cir., 102 F.2d 35, 36, "the evidence as to each was short and simple; there was no reasonable ground for thinking that the jury could not keep separate what was relevant to each." That factor of shortness and simplicity—and of consequent ease of comprehension by the jury—is absent here. McElroy v. United States, 164 U.S. 76, 80, 17 S.Ct. 31, 32, 41 L.Ed. 355, condemned the consolidation of an indictment against one defendant with an indictment against another when the charges were "not provable by the same evidence, and in no sense resulting from the same series of acts." It has been thought that the full rigor of the McElroy doctrine has been somewhat mitigated. But in the cases where it has been so held, the several charges were very closely connected.[8] My colleagues' ruling here is the farthest north of the McElroy case to be found in the books.

Of course I agree that upper courts should not, by demanding perfection and by flyspecking scrutiny of trial records,[8a] obstruct "the criminal prosecution of complicated crimes" unavoidably involving large number of defendants. But a trial even for a single conspiracy is complicated. The complexity of such a trial should not be increased by needlessly injecting into it the trial of another conspiracy. More ought to be done, I think, to prevent prosecutors from employing the excuse of need for "expedition" to use, unnecessarily, conspiracy trials, in which large numbers of defendants are herded into one suit, instead of bringing several actions. The trial dockets are not so congested as to compel such omnibus trials. Any district judge can do much to meet this situation by exercising his discretion, on his own motion, to compel severances.[8b] At any rate, aware of the potential dangers of injustice involved in all conspiracy actions, we ought to be singularly insistent that they be conducted with exceptional fairness. "Expedition" and "efficiency" in the prosecution of crimes ought not to be purchased at the expense of justice. The recent expansion of the activities of so-called "administrative agencies" has centered attention upon their conduct with a result which, on net balance, is beneficent: the demand that dispatch in administration must not lead to infringements on the rights of citizens. Because courts and prosecuting attorneys have a far older tradition than the administrative agencies, it is often forgotten that they, too, are engaged in administration,[9] a truth which, strangely enough, has been obscured by burying it in a revealing phrase, "the administration of justice." That phrase should bring to mind the fact that courts and district attorneys, no less than administrative agencies, are administrators; their task is to "administer" what we call "justice." No more than administrative agencies should they emphasize dispatch in administration to the neglect of their primary function—justice. Here, as elsewhere, the major problem of our times is to reconcile the Expert State and the Free State.[10]

---

[8] United States v. Smith, 2 Cir., 112 F.2d 83, 85; Caringella v. United States, 7 Cir., 78 F.2d 563, 567; Davis v. United States, 5 Cir., 12 F.2d 253, 256.

[8a] National Labor Relations Board v. Air Associates, 2 Cir., 121 F.2d 586, 590; cf. Dunlop v. United States, 165 U.S. 486, 498, 17 S.Ct. 375, 41 L.Ed. 799; Kentucky Tax Cases (Cincinnati, New Orleans & Texas Pacific R. Co. v. Com. of Kentucky), 115 U.S. 321, 335, 6 S. Ct. 57, 29 L.Ed. 414.

[8b] The proposed new Federal Rules of Criminal Procedure provide in Rule 14: "If it appears that a defendant or the government may be prejudiced by a joinder of offenses or of defendants in an indictment or information or in a trial, whether by a multiplicity of counts or of defendants or otherwise, the court at any time upon motion of the defendant, of the government, or of its own motion may order an election or separate trials of counts, grant a severance of defendants, and provide whatever other relief justice may require." (Italics added).

The Committee which drafted these Rules says that Rule 14 "states the present federal law." As to the common-law rule, see, e.g., Drake v. Commonwealth, 214 Ky. 147, 282 S.W. 1066, 1067, 1068; Hoffman v. Commonwealth, 134 Ky. 726, 121 S.W. 690; Powell v. State, 224 Ala. 540, 141 So. 201, 205.

[9] Cf. Thayer, A Preliminary Treatise on Evidence (1898) 274-275; Hutcheson, Separation of Powers and Administrative Law (Address, August 1936); Radin says "that all law is in a sense, and certainly in its inception, 'administrative' law." Radin, Anglo-American Legal History (1936) 76; see Chapters 5 and 6 for historical discussion. Cf. Radin, in My Philosophy of Law (1941) 287, 298.

[10] Catlin, The Story of The Political Philosophers (1937) 361; cf. Laswell and McDougal, supra, 208.

The variance, coupled with the judge's charge, was especially unfair to Rudy. It was only slightly less so as to all the other defendants except Liss and Conte. True, unlike Rudy, none of them requested a charge that the jury keep in mind the respective participations in the second and third conspiracies. But when, as here, irregularities make it highly probable that there was substantial error, we have one of those exceptional cases in which we have been told that we must not refuse to reverse because of the failure of lawyers for defendants to object and except.[11] The devotion to the contentious method of court procedure, according to which each party to the courtroom duel must take the chance that the lawyer he selects as his duelist exercises appropriate skill, can be excessive;[12] particularly in criminal trials should judges refuse to be relegated completely to the role of mere umpires;[13] the accused should not suffer unduly because of the mistakes of his counsel. A "trial in court is never * * * 'purely a private controversy * * * of no importance to the public.' "[14] The Supreme Court recently admonished us that Congress when, in 28 U.S.C.A. § 391, it provided that appellate courts shall give judgment "without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties", did not intend that, where there have been substantial infringements of the right to a fair trial, we can ignore them.[15] I must confess that I do not understand those persons—I do not include my colleagues among them—who, while purporting to worship the jury, applaud when the "harmless error" doctrine is pushed to such an extreme as it is in the majority opinion here. My colleagues, in stating that there is a "modern disposition to assume that an error has been harmless," have failed to note what five circuit courts have observed:[16] there has been a new trend in the Supreme Court concerning that doctrine since at least 1936;[17] the rule is now said to be that, if error is shown, there must be reversal "unless it affirmatively appears from the whole record that it was not prejudicial."

[11] See, e.g., Wiborg v. United States, 163 U.S. 632, 658, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555; Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345; New York C. R. Co. v. Johnson, 279 U.S. 310, 318, 49 S.Ct. 300, 73 L.Ed. 706; Crawford v. United States, 212 U.S. 183, 194, 29 S.Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392; Van Gorder v. United States, 8 Cir., 21 F.2d 939, 942; Meadows v. United States, 65 App.D.C. 275, 82 F.2d 881, 884.

See also Rule 10 of this court which provides that "the court, at its option, may notice a plain error not assigned"; United States v. Trypuc, 2 Cir., June 11, 1943, 136 F.2d 900.

[12] In re Barnett, 2 Cir., 124 F.2d 1005, 1010, 1011.

[13] Cf. my dissenting opinion in United States v. St. Pierre, 2 Cir., 132 F.2d 837, 849.

[14] New York Central R. Co. v. Johnson, 279 U.S. 310, 318, 49 S.Ct. 300, 303, 73 L.Ed. 706.

[15] Bruno v. United States, 308 U.S. 287, 294, 60 S.Ct. 198, 84 L.Ed. 257.

[16] See Fort Dodge Hotel Co. v. Bartelt, 8 Cir., 119 F.2d 253, 259; Lynch v. Oregon Lumber Co., 9 Cir., 108 F.2d 283, 285, 286; Farris v. Interstate Circuit, 5 Cir., 116 F.2d 409, 412; Little v. United States, 10 Cir., 73 F.2d 861, 866, 96 A.L. R. 889; Worcester v. Pure Torpedo Co., 7 Cir., 127 F.2d 945, 947, 948.

[17] See McCandless v. United States, 298 U.S. 342, 347, 348, 56 S.Ct. 764, 766, 80 L.Ed. 1205; Bruno v. United States, supra. Cf. discussion in my dissent in Keller v. Brooklyn Bus Corp., 2 Cir., 128 F.2d 510, 513, 514, 515. The harmless error doctrine (if kept within proper limits) is highly desirable; cf. In Matter of Barnett, 2 Cir., 124 F.2d 1005, 1011.

Federal Rules of Civil Procedure, rule 61, 28 U.S.C.A. following section 723c, promulgated since the enactment of 28 U.S.C.A. § 391, embodies that doctrine. That statute applies, literally, only to the trial courts, because the Act authorizing the Rules did not authorize Rules affecting appellate jurisdiction (3 Moore, Federal Practice 3155), but the Rules have been applied by analogy on appeal; In Matter of Barnett, supra; N.L.R.B. v. Remington-Rand, 2 Cir., 130 F.2d 919, 925. It is hardly to be presumed that the Supreme Court intended the "harmless error" Rule to be given a broader interpretation than it has given to the "harmless error" statute. Cf. University City v. Home, etc., Ins. Co., 8 Cir., 114 F.2d 288, 295; see also the cases cited in note 16, four of which were decided since the Rules went into effect; the same is true of the Bruno case.

In any event, while 28 U.S.C.A. § 391 covers both civil and criminal cases, those civil Rules do not apply to criminal cases.

On Rehearing.

PER CURIAM.

The defendant, Rudy, now raises for the first time the objection that, since we have declared that the alleged conspiracy was really three conspiracies, the only one to which he was a party took place wholly in New Jersey. We can see no answer to this, for reasons which we have stated in United States v. Zeuli, 2 Cir., 137 F.2d 845, handed down herewith. Rudy's conviction will be reversed, and the indictment against him will be dismissed.